Michael F. MALONE; Seth Rosenberg, Plaintiffs–Appellants,

v.

MICRODYNE CORPORATION; Philip Cunningham; Christopher M. Maginniss, Defendants–Appellees.

No. 93–1781.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 8, 1994.

Decided June 8, 1994.

**ARGUED:** I. Stephen Rabin, Rabin & Garland, New York City, for appellants. David Allen Donohoe, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, DC, for appellees. **ON BRIEF:** Joseph P. Garland, Brian Murray, Rabin & Garland, New York City; Paul Kaplan, Michael L. Shor, David & Hagner, P.C., Washington, DC; Jeffrey

Squire, Kaufman, Malchman, Kirby & Squire, New York City, for appellants. Clinton R. Batterton, C. Fairley Spillman, Judith E. Beach, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, DC, for appellees.

Before MURNAGHAN, Circuit Judge, BUTZNER, Senior Circuit Judge, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.

Reversed and remanded by published opinion. Judge MURNAGHAN wrote the opinion, in which Senior Judge BUTZNER and Senior Judge JOSEPH H. YOUNG joined.

## OPINION

MURNAGHAN, Circuit Judge:

At the trial of this securities-fraud class action brought by purchasers of the common stock of Microdyne Corporation, the district court heard the plaintiffs' evidence and then granted judgment as a matter of law for the defendants, Microdyne Corporation and two of its officers. The plaintiffs have appealed, arguing that the case should have gone to the jury.

### I. *THE FACTS* [1]

A. *Microdyne Corporation*

Defendant Microdyne Corporation is a computer hardware and software company headquartered in Alexandria, Virginia. The other two defendants are Philip T. Cunningham, the Chairman and President of Microdyne and the owner of about seventy percent of its total common stock, and Christopher M. Maginniss, the corporation's Chief Financial Officer.

In late 1991 Microdyne entered into an agreement with a major computer networking company for the joint development of a number of new networking products. The first two of those products were the NetWare Access Server by Microdyne ("NAS") and the NetWare Asynchronous Communications Server by Microdyne ("NACS"). Beginning

---

1. We, of course, view the evidence in the light most favorable to the plaintiffs, who opposed the defendants' motion for judgment as a matter of law. *See Goedel v. Norfolk & W. Ry. Co.,* 13 F.3d 807, 810 (4th Cir.1994); *Alevromagiros v. Hechinger Co.,* 993 F.2d 417, 420 (4th Cir.1993).

in March 1992, Microdyne would sell NAS (and later NACS) units to distributors who, in turn, would attempt to sell them to dealers and end users (customers). Central to the instant appeal are seven statements that Microdyne made in 1992. The plaintiffs-appellants have alleged that the statements were materially false or misleading and caused the market price of Microdyne common stock to be artificially inflated for nearly .eight months in 1992, during which time the appellants and all members of the class they represent purchased such stock.

### B. The Seven Allegedly False or Misleading Statements

The appellants have claimed that the first of the seven statements was essentially forward-looking but lacked any reasonable basis and thus was false and misleading. The other six statements, they have claimed, were false or misleading because they omitted critical facts and violated generally accepted accounting principles. Specifically, Microdyne (1) booked and reported NAS transactions as final sales even though the distributors to whom NAS products were shipped had the right to return the products if they could not sell them; and (2) failed to disclose the *actual* return of more than forty percent of the NAS products reportedly "sold" to distributors. We briefly summarize each of the seven challenged statements.

1. *The "Comfort" Statement—February 12.* On February 12, 1992,[2] Cunningham said in response to an inquiry from a Dow Jones reporter that he was "comfortable with the earnings estimates for fiscal 1992 and 1993 prepared by Hancock Institutional Equity Services analyst William B. Becklean." The day before, Becklean had publicly predicted that Microdyne would earn 80 cents per share in fiscal year 1992 and $1.05 the following year, an increase from the 76 cents per share that the company had earned in fiscal year 1991. Cunningham also was quot-

ed in the Dow Jones report as saying, "The data communications market is booming and it's exciting."

2. *The Second–Quarter Press Release—April 23.* In a press release dated April 23, Microdyne reported its second-quarter financial performance, including $21,515,000 in total company revenues. Although the press release did not separately report revenues from NAS, that product accounted for about $2.9 million, or 13%, of the total reported revenues. The release made no mention of the fact that Microdyne had granted some distributors the right to return NAS units that they could not sell, with no obligation to purchase an equal amount of other Microdyne products.[3]

3. *The Second–Quarter Form 10–Q—May 15.* Microdyne's Form 10–Q for the second quarter, filed with the Securities and Exchange Commission (SEC) on May 15, stated that "$2.9 million [in revenues] was associated with sales of the Company's new NetWare Access Server (NAS)." The Form 10–Q made no mention of the distributors' rights of return.

4. *The "Earnings Preview" Press Release—June 15.* On June 15 Microdyne issued a press release entitled "MICRODYNE SEES REVENUE, EARNINGS SHORTFALL IN THIRD QUARTER." The opening paragraph explained that the company's third-quarter revenues and earnings "would fall short of analyst expectations" and that "slower than expected initial sales of two major new products [NAS and NACS] would cause the shortfall." The release continued:

> Philip T. Cunningham, Chairman and President of Microdyne, said a preliminary forecast indicated that the shortfall would result in quarterly earnings of from 8 cents to 12 cents for the third quarter versus analyst estimates [*i.e.*, Becklean's February estimate] of 26 cents. Previously, Mr.

---

2. Unless otherwise noted, all dates refer to calendar year 1992. References to Microdyne's quarterly accounting are based on a fiscal year that ran from October 1 through September 30. Hence, the second quarter of fiscal 1992 ran from January 1 through March 31, 1992; the third quarter from April 1 to June 30, 1992.

3. Microdyne has noted that it sold *some* of the $2.9 million worth of NAS without granting an absolute, unconditional right of return.

Cunningham had said he was "comfortable" with Street estimates.

The new products ... were expected to generate $7 million of Microdyne's anticipated $27+ million of revenues for the quarter. Instead, [NAS] and [NACS] are expected to have sales of less than $2 million.

"We misjudged the length of the product's selling cycle," Mr. Cunningham said. "We expected to close sales in 30 to 60 days. Instead, the product is taking 90 days or longer to sell in quantity."

"Our estimate of the product's eventual success has not changed," he said. "We have commitments to buy the product from major customers, and early users give it enthusiastic reviews. Customers with the potential to buy hundreds of these systems have evaluation units installed. On the whole, our sense is that we have deferred sales from the third quarter into subsequent quarters. Over the longer term, we believe we have a product that can generate as much as $30 million in annual revenue."

The press release made no mention of the fact that distributors had told Microdyne that they were planning to return substantial quantities of NAS that had been shipped in March and for which revenue had been booked in the second quarter.

5. *The Third–Quarter Press Release— July 21.* In a July 21 press release, Microdyne announced its third quarter results. The press release stated that net income was down 47% from the third quarter of the prior fiscal year and net income per share had fallen 58%. Microdyne attributed the earnings decline to "lower than expected sales of new products, coupled with higher marketing, sales, and related expense." Cunningham's June 15 statement was largely repeated: " 'As we reported in our mid-June earnings preview, we misjudged the length of the selling cycle of our NetWare Access Server by Microdyne. Volume sales that we expected to begin closing immediately instead will take 90 days or longer to sell in quantity.' " The release cited Cunningham's statement that

the company's management had examined the causes of the new products sales short-

fall, and had not changed their opinion of the eventual acceptance of the lines. "It is a question of timing," he said. "Users are giving enthusiastic reviews to our NetWare Access Server by Microdyne and its companion product, the NetWare Asynchronous Communications Server by Microdyne. Customers with the potential to buy hundreds of these systems have evaluation units installed and sales in the first three weeks of this quarter have accelerated markedly. Therefore, over the longer term we believe we have a product that will generate as much as $30 million in annual revenue."

Once again, the release did not mention distributors' returns of NAS, which Microdyne's internal figures then estimated at more than one million dollars.

6. *The Third–Quarter Form 10–Q—August 12.* Microdyne's Form 10–Q for the third quarter, filed with the SEC on August 12, reiterated that "lower than expected sales of new products, coupled with higher levels of marketing, sales, and related expense, were responsible for an earnings decline. Specifically, initial sales of NetWare Access Server (NAS) and NetWare Asynchronous Communications Server (NACS) were slower than expected." Nevertheless, the quarterly report stated, "NAS and NACS are well placed to succeed. The market reaction to these products has been very positive. Although there is no certainty that this expectation will be met, management remains optimistic of the market acceptance of NAS and NACS." The report did not explain that only three percent of the company's total third-quarter revenues ($583,000 out of $18 million) represented NAS and NACS sales. It also made no mention of the $1.2 million in NAS returns that Microdyne booked in July.

7. *The Third–Quarter Shareholders' Report—August 14.* Microdyne's August 14 report to shareholders for the third quarter largely mimicked its July 21 press release, sometimes verbatim. Cunningham wrote in the August 14 report that "[c]ustomers with the potential to buy hundreds of these systems [NAS and NACS] have evaluation units installed and sales in the first month of the fourth quarter [*i.e.,* July 1992] have acceler-

ated markedly." Again, Microdyne made no mention of the returns.

8. *The Press Release of October 6.* Finally, in a press release dated October 6—which is *not* one of the seven statements challenged by the appellants—Microdyne announced that the anticipated sales of NAS and NACS had not materialized and that it was taking an after-tax loss of 51 cents per share for the fourth quarter and a loss for fiscal year 1992, which necessitated layoffs and restructuring. In the eight months that had transpired since the February 12 "comfort" statement, the price of Microdyne stock had fallen dramatically, Cunningham's personal losses had exceeded $100 million, and members of the plaintiff class had suffered damages that they have estimated at approximately $9 million.

## C. The Securities–Fraud Class Action

In the fall of 1992, plaintiffs-appellants Michael F. Malone and Seth Rosenberg brought a "fraud on the market" action in the United States District Court for the Eastern District of Virginia. They alleged that Microdyne violated Section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder, by making seven false or misleading statements about Microdyne's business that inflated the price of the corporation's common stock for almost eight months in 1992. The district court certified the case as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, and designated Malone and Rosenberg as representatives of the class of all purchasers of that stock between February 12 and October 7, 1992. *See Malone v. Microdyne Corp.*, 148 F.R.D. 153, 154–59 (E.D. Va.1993). At the close of discovery, the court denied Microdyne's motion for summary judgment.

The court granted Microdyne's motion *in limine* to exclude from evidence the Form 10–K annual report that Microdyne had filed with the SEC for fiscal year 1992, on the ground that the report was evidence of a subsequent remedial measure under Rule 407 of the Federal Rules of Evidence. At trial, the plaintiffs presented evidence to the jury for three days. At the close of the plaintiffs' case, the district court granted the defendants' motion for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure and dismissed the case. Two weeks later the court amplified its bench ruling in a memorandum opinion. *Malone v. Microdyne Corp.*, 824 F.Supp. 65, 65–69 (E.D.Va.1993). The plaintiffs filed a timely notice of appeal.

## II. DISCUSSION

### A. The Grant of Judgment as a Matter of Law

1. *Standard of Review.* The appellants' primary argument is that the district court erred in granting defendants' motion for judgment as a matter of law. Rule 50(a) provides that, in actions tried by a jury, the district court may grant a motion for judgment as a matter of law if "a party has been fully heard ... and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." Fed.R.Civ.P. 50(a)(1). We review the grant of a Rule 50(a) motion *de novo*. *See Parker v. Prudential Ins. Co.*, 900 F.2d 772, 776 (4th Cir. 1990).[4]

2. *Section 10(b) and Rule 10b–5 Claims.* Section 10(b) of the 1934 Act makes it

> unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as

---

4. We reject appellants' suggestion that the district court should have denied Microdyne's Rule 50(a) motion simply because the court had earlier denied Microdyne's Rule 56 motion for summary judgment. *See Kim v. Coppin State College*, 662 F.2d 1055, 1059 (4th Cir.1981) (stating that a court may grant a motion for a directed verdict after denying the same party's motion for summary judgment); *see also* Fed.R.Civ.P. 50(a) advisory committee note (1991) (recommending

that a district court that is uncertain about how to rule on a defendant's summary judgment motion should (1) deny that motion, (2) schedule the jury trial to begin with a presentation on the essential element that the plaintiff seems least likely to be able to maintain, and (3) if the plaintiff is indeed unable to maintain that element, grant judgment as a matter of law for the defendant as soon as the plaintiff has been fully heard).

the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5, which the SEC promulgated under § 10(b), provides in relevant part:

It shall be unlawful for any person ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, ... in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■ To establish liability under § 10(b) and Rule 10b–5, a plaintiff must prove the following elements: (1) the defendant made a false or misleading statement of material fact (2) with scienter (3) upon which the plaintiff justifiably relied [5] (4) that proximately caused the plaintiff's damages. *See Cooke v. Manufactured Homes, Inc.,* 998 F.2d 1256, 1260–61 (4th Cir.1993); *Myers v. Finkle,* 950 F.2d 165, 167 (4th Cir.1991); *Schatz v. Rosenberg,* 943 F.2d 485, 489 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992).

The Supreme Court has stated that Rule 10b–5 claims are fact-specific and that disputes about the existence of their elements typically cannot be resolved as a matter of law. *See Cooke,* 998 F.2d at 1262 (citing the Supreme Court's holdings in *Basic Inc. v. Levinson,* 485 U.S. 224, 239–41, 108 S.Ct. 978, 987–89, 99 L.Ed.2d 194 (1988), and *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2132–33, 48 L.Ed.2d 757 (1976)).

Here, the district court entered judgment as a matter of law for the defendants entirely on the first element, holding that the plaintiffs had presented no evidence that Microdyne's statements were false or misleading. *See Malone,* 824 F.Supp. at 66, 68. On appeal, Microdyne has sought affirmance on the grounds that (1) the plaintiffs failed to prove that the statements were false or misleading, and (2) the plaintiffs failed to prove that the defendants made the statements with scienter.

3. *The Six Statements from April to August 1992.* The appellants' principal contention is that Microdyne intentionally issued six statements, from April to August of 1992, that contained material misrepresentations of the company's sales and revenues. Specifically, Microdyne overstated its sales and revenues by failing to disclose either the distributors' rights of return or the actual product returns. Thus, transactions that were tantamount to consignments and that should have been recorded as transactions with a right of return were instead reported as actual, regular sales.[6]

■ a. *False or misleading statements.* In a nutshell, the appellants' theory of the case is that, in the winter of 1992, Cunningham assured the financial community that Microdyne would sell three million dollars' worth of its new NAS/NACS products in the second quarter of the fiscal year. When the distributors balked, refusing to place three million dollars' worth of orders, Microdyne sweetened the deal by granting them unconditional rights of return. The distributors' initial skepticism proved prescient, and they began exercising their rights of return, eventually sending back to Microdyne almost half of the NAS units they had previously "purchased." Rather than promptly disclosing the whole debacle, Microdyne issued a series of misleading statements throughout the

---

**5.** When purchasers of stock pursue an action under a "fraud on the market" theory, as the plaintiffs have done here, they are relieved of proving the element of direct reliance. It is presumed that a materially false or misleading statement regarding a company or its business defrauded purchasers of the company's stock even if they did not directly rely on the statement because they relied instead on the integrity of the price set by the market. *See Basic Inc. v. Levinson,* 485 U.S. 224, 241–50, 108 S.Ct. 978, 988–

93, 99 L.Ed.2d 194 (1988); *Cooke v. Manufactured Homes, Inc.,* 998 F.2d 1256, 1261 (4th Cir.1993).

**6.** A consignment is a transaction in which goods are delivered by a consignor to a dealer or distributor (the consignee) primarily for sale by the consignee, and the consignee has the right to return any unsold commercial units of the goods in lieu of payment.

spring and summer before finally correcting the public record in October. The market relied upon the misleading statements and thereby kept Microdyne's stock price artificially inflated, much to the detriment of the stock's purchasers.

At trial the plaintiffs called to the stand three former Microdyne employees—the vice president of sales, the national sales manager for distribution, and a regional sales manager—to testify regarding the rights of return. They testified that the number of NAS units that management demanded be shipped was not based on what the salespeople thought could be sold, but rather on commitments that Microdyne Chairman and President Cunningham had made to the financial community. Microdyne's Vice President of Sales, who was responsible for selling NAS and NACS to distributors, testified that in order to sell the products, distributors were told, "If they don't sell, then you could return the product," that this return privilege was not "normal," that the normal limited right of return was part of a stock-rotation plan in which the distributor had to give a "corresponding purchase order to buy another product," and that, by contrast, "in the case of the NAS/NACS, we allowed them to return product without any replacement purchase order. They could just return the product."

The national sales manager testified that Microdyne never tried "to make a distributor pay for NAS/NACS products that he wished to return," and that "full return privileges" were extended in writing to one distributor and verbally to other distributors. The regional sales manager testified that Microdyne's distributors "would take the [NAS/NACS] product down with the understanding that they could return the product at any time they wanted without having to issue an offsetting purchase order," and that

those distributors did in fact return NAS/NACS products.

At trial, the plaintiffs also called Harris Devor, a C.P.A., as an expert in accounting. Prior to testifying, Devor had examined each of the allegedly false or misleading statements and had attended the depositions of Microdyne's accountants. He also had reviewed deposition transcripts, pleadings, and briefs in the case, as well as invoice and return authorizations issued by Microdyne.

Devor testified that, in his expert opinion, Microdyne had failed to comply with Financial Accounting Standard No. 48 (FAS 48) of the Generally Accepted Accounting Principles (GAAP),[7] which Microdyne concedes it was required to follow. FAS 48 establishes six conditions that must be met before a company can recognize revenue when it sells its product but gives the buyer a right to return the product.[8] One of the six conditions is that "[t]he amount of future returns can be reasonably estimated." Statement of Financial Accounting Standards No. 48, ¶ 6 (Fin. Accounting Standards Bd.1981) (footnote omitted). FAS 48 specifies several factors that may impair a company's ability to make a reasonable estimate of the amount of future returns, including the "[a]bsence of historical experience with similar types of sales of similar products." *Id.* ¶ 8. If the company cannot reasonably estimate the amount of future returns at the time of sale, it should not recognize any sales revenue from the transaction until either (1) the return privilege has substantially expired, or (2) the company has become capable of making a reasonable estimate of future returns, whichever occurs first. When sales revenues do become properly recognizable, they must be reduced to reflect actual past returns and estimated future returns, *e.g.*, by establishing

---

7. "Promulgated by the accounting profession's Financial Accounting Standards Board, 'generally accepted accounting principles' are the conventions, rules, and procedures that define accepted accounting practices." *United States v. Arthur Young & Co.*, 465 U.S. 805, 811 n. 7, 104 S.Ct. 1495, 1500 n. 7, 79 L.Ed.2d 826 (1984).

8. FAS 48 applies to consignment transactions in which the buyer has an unconditional right of

return. *See* Dennis Kremer, *Revenue Recognition* (PLI Litig. & Admin. Practice Course Handbook Series, 1984) (interpreting FAS 48 and other authoritative sources on revenue recognition). It may be possible to draw a meaningful distinction between a "consignment" transaction and "an absolute sale with a right of return" for some purposes, *see, e.g., Fowler v. Pennsylvania Tire Co.*, 326 F.2d 526 (5th Cir.1964) (bankruptcy case), but any such distinction is irrelevant to the present case.

a "reserve" for returned merchandise. *See id.* ¶ 6.

Devor testified that, in his expert opinion, Microdyne violated FAS 48 repeatedly, beginning with the issuance of its second-quarter press release on April 23 and continuing up until the issuance of its corrective press release on October 6, 1992. Devor explained that, in the spring of 1992, Microdyne had no experience with NAS or any similar products, and thus it was incapable of reasonably estimating the amount of future returns of NAS. Therefore, in keeping with FAS 48, Microdyne's April and May statements should not have recognized *any* of the $2.9 million in NAS-related, second-quarter revenue for which distributors had a right of return. Including the entire $2.9 million in Microdyne's reported second-quarter revenues made those statements untrue.

Devor testified that Microdyne's July and August statements were also improper because they indicated no "reserve" reflecting Microdyne's best estimate for the total amount of NAS returns (approximately $1.2 million worth, according to the company's internal figures in July). Devor further testified that Microdyne's failure to record the NAS transactions properly left the investing public with the impression that Microdyne's second-quarter income (before taxes) had increased about $600,000 from the same quarter in the prior year, when in fact it had *decreased* about $600,000. Therefore, Devor concluded, the omissions of any reference to the $1.2 million in product returns made Microdyne's statements not only misleading, but misleading in a material way.

The Financial Accounting Standards of GAAP and the antifraud rules promulgated under § 10(b) of the 1934 Act serve similar purposes, and courts have often treated violations of the former as indicative that the latter were also violated. The prohibitions contained in the GAAP and in Rule 10b–5, however, are not perfectly coextensive. In some circumstances, courts have found defendants liable for securities fraud under Rule 10b–5 despite having complied with GAAP, *see, e.g., Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 378 F.Supp. 112, 121–22 (S.D.N.Y.1974), *rev'd in part on other grounds,* 540 F.2d 27 (2d Cir.1976), while in other circumstances, courts have discharged defendants from Rule 10b–5 liability notwithstanding deliberate violations of GAAP, *see Vosgerichian v. Commodore Int'l,* 832 F.Supp. 909, 915 n. 8 (E.D.Pa.1993) (citing cases); *SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1240 (S.D.N.Y.1992).

We cannot find a single precedent, however, holding that a company may violate FAS 48 and substantially overstate its revenues by reporting consignment transactions as sales without running afoul of Rule 10b–5. The case law clearly states that such a company may be held liable under § 10(b) and Rule 10b–5 for making false or misleading statements of material fact. *See Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 572–76 (2d Cir.) (holding defendants liable for securities fraud because they reported consignment transactions as sales), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982); *see also Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962, 970–71 (E.D.N.Y.1988) (stating that it is a "fraudulent practice[ ]" to treat as sales "[t]ransactions that were really consignments").

Therefore, Devor's expert testimony, in conjunction with the former Microdyne employees' testimony and the other evidence that the plaintiffs presented at trial, provided a legally sufficient evidentiary basis on which a reasonable jury could find that the defendants had made six false or misleading statements of material fact under § 10(b) and Rule 10b–5. Thus, the district judge erred in taking that issue from the jury.

■ b. *Statements made with scienter.* The defendants have contended that even if the six statements were false or misleading, the district court could have properly granted them judgment as a matter of law because they did not make the statements with scienter. We reject that argument, too.

■ In the present context, "the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381–82 n. 12, 47

L.Ed.2d 668 (1976).[9]  Proof of scienter need not be direct, but may be inferred from circumstantial evidence.  *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 691–92 n. 30, 74 L.Ed.2d 548 (1983).  In a Rule 10b–5 action, issues of intent typically go to the jury and defendants are not entitled to judgment as a matter of law "on the ground of lack of scienter unless the plaintiff has failed to present facts that can support an inference of bad faith or an inference that defendants acted with an intent to deceive," manipulate, or defraud.  *Wechsler v. Steinberg,* 733 F.2d 1054, 1058–59 (2d Cir.1984); *cf.  Fine v. American Solar King Corp.,* 919 F.2d 290, 297 (5th Cir.1990) ("[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, *without more,* does not establish scienter." (emphasis added)) (dictum), *cert.  dismissed,* —— U.S. ——, 112 S.Ct. 576, 116 L.Ed.2d 601 (1991).

Here, the plaintiffs have presented direct testimony from former Microdyne sales executives to the effect that, in the spring of 1992 (1) Cunningham, Microdyne's Chairman and President, instructed his sales staff to move out about three million dollars' worth of NAS before the end of the second quarter in order to satisfy a commitment that he had previously made to the financial community; and (2) Cunningham or other top Microdyne officials learned, sequentially, that (a) the goods could only be shipped with generous return privileges, (b) the Microdyne sales staff granted such privileges, and (c) a large fraction of all NAS products actually were returned by the distributors in July.  Nevertheless, the defendants issued a stream of six false or misleading statements, which referred neither to the rights of return nor to the actual product returns.  Furthermore, those public statements continued to assert that the product's "selling cycle" was simply longer than anticipated and that predicted sales were being merely "deferred" and that "[i]t is [only] a question of timing"—notwithstanding the fact that the distributors' actual

returns of the initial shipments had by then become an avalanche.

That evidence is more than sufficient to support a fact-finder's inference that Cunningham and the other defendants intended to deceive, manipulate, or defraud investors.  Therefore, plaintiffs' evidence raised at least a triable issue on scienter, which the judge should not have kept from the jury.  *See Cooke,* 998 F.2d at 1262; *Sirota,* 673 F.2d at 576.  Thus, we must reverse the district court's grant of judgment as a matter of law and remand the case for a new trial.

■  4.  *The February 12th Statement.*  Next we turn to Cunningham's statement of February 12, 1992, in which he expressed his "comfort" with an analyst's prediction of Microdyne's future earnings for fiscal years 1992 and 1993.  The February 12th statement—unlike the other six challenged statements—was purely a projection of Microdyne's future performance, rather than a report of its past or present results.

■  In a decision handed down last year, we drew a clear distinction between a company's strict "duty to accurately report … its *past* results," on the one hand, and the company's relative freedom to "prognosticat[e]" or make "predictions of its *future* business prospects," on the other hand.  *Raab v. General Physics Corp.,* 4 F.3d 286, 287, 289 (4th Cir.1993) (emphasis added).  Misstatements or omissions regarding actual *past* or *present* facts are far more likely to be actionable than statements regarding projections of *future* performance.  Generally, the latter will be deemed actionable under § 10(b) and Rule 10b–5 only if they are supported by specific statements of fact or are worded as guarantees.  *See id.* at 289–90.

Cunningham's statement of "comfort" with an analyst's predictions cannot be deemed actionable under the standard we laid down in *Raab.* His statement obviously did not constitute a guarantee and was certainly not

---

9.  Most circuits have held that recklessness also may satisfy the scienter requirement.  *See Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568–69 & n. 6 (9th Cir.1990) (en banc), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991).

specific enough to perpetrate a fraud on the market. *See id.*

Because we hold that the February 12 "comfort" statement is not actionable as a matter of law, on remand the district court will have to narrow and re-certify the plaintiff class. The class should consist of all purchasers of Microdyne common stock between April 23 and October 7, 1992, not between February 12 and October 7.[10]

### B. *Excluding the 1992 Form 10–K Annual Report*

■ The appellants also have argued that the district judge abused his discretion by granting Microdyne's motion *in limine* to exclude from evidence Microdyne's Form 10–K annual report for fiscal year 1992. The Form 10–K, filed with the SEC on December 29, 1992, disclosed that "[t]he Company provides terms of net 30 days for most products it sells. On certain products, those terms may be extended to 90 days at the discretion of management. Microdyne's agreements with distributors allow products to be returned for credit under certain conditions." The district judge, following Judge Friendly's opinion in *SEC v. Geon Industries, Inc.,* 531 F.2d 39, 52 (2d Cir.1976) (applying Federal Rule of Evidence 407 in the securities context), held that the annual report contained evidence of subsequent remedial measures and therefore was inadmissible. We review that evidentiary ruling for an abuse of discretion.

Rule 407 of the Federal Rules of Evidence provides:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precau-

tionary measures, if controverted, or impeachment.

Fed.R.Evid. 407.

Microdyne has argued that the plaintiffs wanted to use the above-quoted disclosure in the 1992 Form 10–K as an admission that Microdyne should have made similar disclosures in the quarterly Form 10–Qs that it filed with the SEC on May 15 and August 12. The appellants have argued that they wanted to offer the annual report as evidence of "an admission of a hotly contested fact": that Microdyne granted unconditional rights of return and extraordinary credit terms to its distributors.

On this issue, we agree with Microdyne. The potential prejudice from introducing the Form 10–K is clear: jurors likely would view its disclosure of rights of return as proof of culpable conduct, akin to a landlord's fixing a stairway after being sued by an injured tenant. The probative value of the Form 10–K for other purposes is dubious. There was plenty of other evidence at trial to show that some of the distributors could, and did, return unsold NAS units to Microdyne. Furthermore, nothing in the Form 10–K could establish the terms of the particular NAS and NACS transactions. Thus, the district judge did not abuse his discretion in excluding the 10–K.

Accordingly, we reverse the judgment of the district court and remand the case for a new trial.

*REVERSED AND REMANDED.*

■

---

**10.** Although the February 12th statement cannot, as a matter of law, provide an independent basis for a securities fraud claim under Rule 10b–5, the district judge may nevertheless deem it admissible for some other purpose at the second trial.