UNPUBLISHED

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

THE MARSH GROUP,
                    *Plaintiff-Appellant,*

       and

DAVID GRAFF, Individually and on
behalf of all others similarly
situated; IRWIN J. BERLIN, on behalf
of himself and all others similarly
situated; ROBERT CORWIN,
Individually and on behalf of all
others similarly situated; CARL
GOLDMAN, Individually and on
behalf of all others similarly
situated; LOUIS CAROLA, on behalf of
himself and all others similarly
situated; JERRY TOWBIN, individually
and on behalf of all other similarly
situated; SUSAN TOWBIN, individually
and on behalf of all others similarly
situated; THEODORE ROLE, Trustee,
individually and on behalf of all
other similarly situated,
                              *Plaintiffs,*

       v.

PRIME RETAIL, INCORPORATED;
WILLIAM H. CARPENTER; ABRAHAM
ROSENTHAL; MICHAEL W. RESHKE;
ROBERT P. MULREANEY; GLENN D.
RESCHKE,
                    *Defendants-Appellees.*

No. 01-2500

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-00-3080-JFM, CA-00-3179-JFM, CA-00-3212-JFM,
CA-00-3253-JFM, CA-00-3305-JFM, CA-00-3571-JFM, CA-00-
3629-JFM)

Argued: June 4, 2002

Decided: August 30, 2002

Before KING and GREGORY, Circuit Judges, and
Robert R. BEEZER, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

---

Affirmed by unpublished per curiam opinion.

---

**COUNSEL**

**ARGUED:** Seth David Rigrodsky, MILBERG, WEISS, BERSHAD,
HYNES & LERACH, L.L.P., New York, New York, for Appellant.
Laurie Beth Smilan, WILSON, SONSINI, GOODRICH & ROSATI,
McLean, Virginia, for Appellees. **ON BRIEF:** Michael C. Spencer,
MILBERG, WEISS, BERSHAD, HYNES & LERACH, L.L.P., New
York, New York; John B. Isbister, James J. O'Neill, III, TYDINGS
& ROSENBERG, Baltimore, Maryland, for Appellant. Lyle Roberts,
J. Christian Word, WILSON, SONSINI, GOODRICH & ROSATI,
McLean, Virginia; Bruce G. Vanyo, WILSON, SONSINI, GOOD-
RICH & ROSATI, Palo Alto, California; David Clarke, Jr., PIPER
RUDNICK, L.L.P., Washington, D.C., for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

---

**OPINION**

PER CURIAM:

The Marsh Group appeals the district court's dismissal, pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4, *et seq.*, of its securities fraud class action claims against Prime Retail, Inc., and several of Prime Retail's senior officers and directors. For reasons that follow, we affirm.

I.

Prime Retail is a Real Estate Investment Trust (REIT) that owns, constructs, leases, markets, and manages outlet centers throughout the nation. Between 1994—the year of Prime Retail's first public offering of securities—and 1998, the company experienced explosive growth, with its annual funds from operations (FFO), a common indicator of REIT financial health, jumping from $25.8 million to $89 million.

Prime Retail earns revenues mostly from percentage lease arrangements with retailers in its outlets. As a REIT, it does not pay federal income tax, but it is required to distribute 95% of its income to shareholders as dividends. Up until the fourth quarter of 1999, the company was paying quarterly dividends in amounts representing approximately 15% growth over the same quarter in the prior year.

In 1998, Prime Retail announced two important developments: First, that it was acquiring Horizon Group Inc., another outlet center owner; and second, that it was embarking on international operations by developing an outlet center in Puerto Rico. As a result of the Horizon acquisition, consummated in June 1998, the company doubled its size and became the nation's largest outlet center owner, with 51 malls in 26 states.

The Appellants* allege that various company insiders were aware

---

*Appellant Marsh Group, an investor group, was appointed Lead Plaintiff pursuant to the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a).

that the company was deteriorating during this time period. According to the Appellants, by spring 1999, it was apparent to the company's senior management that the Horizon properties needed significant improvement funds, additional personnel, and improved management expertise. Internal company reports allegedly showed that vacancies were rising, and revenues were falling. The Puerto Rico project ran into immediate problems because the company could not obtain a construction loan and had to develop the property using internal funds.

According to the Appellants, despite management's awareness of these problems, Prime Retail remained very optimistic in publicly describing the company's financial results and prospects. The focus of this appeal is on statements made to securities analysts, primarily David Fick of Legg Mason Wood Walker, Inc. The allegedly false statements were made in the second half of 1999 and during January of 2000, and related to the company's financial results and dividends for the second, third, and fourth quarters of 1999.

On August 12, 1999, Prime Retail reported that its FFO for the second quarter of 1999 had increased by 52% ($9 million) and that its FFO for the first six months of 1999 had increased 61%, when compared to the same periods in 1998. On the strength of these results, Prime Retail declared a quarterly cash dividend on its common stock for the second quarter in the amount of $0.295 per share.

David Fick's first report was issued on August 13, 1999, the day after the company's second quarter earnings press release. Fick reaffirmed his "Buy" recommendation, stating:

> Management has assured the investment community repeatedly that Prime's current dividend is sacred. As noted in our previous wires, a cut in the dividend is unlikely unless the debt maturities and other capital requirements are not funded; the company has good coverage based on current and projected funds from operations.

Consol. Am. Compl. ¶ 51. In a brief report on October 1, 1999, Fick reaffirmed his "Buy" recommendation, stating: "Importantly, manage-

ment stated to us this week that continued payment of the common dividend remains 'sacrosanct.'" *Id.* ¶ 52.

In addition to the Fick reports, the Appellants allege that during a meeting with analysts from Friedman Billings Ramsey, Inc. on October 15, 1999, defendants Rosenthal and Mulreany "stated very clearly that [Prime Retail] is committed to the current dividend." *Id.* ¶ 53.

Prime Retail announced its third quarter results and dividend on November 8, 1999. The company issued a press release, stating: "For the three and nine months ended September 30, 1999, FFO per diluted share increased 2.7% and 13.0%, respectively, compared to the same 1998 periods." Again, Prime Retail declared a quarterly cash dividend of $0.295 per share.

On November 9, 1999, Fick issued another analyst report, lowering his rating of Prime Retail to "Market Performance" (i.e., performance in line with the market generally). Under the heading "Valuation," Fick wrote:

> Our thesis for the stock over the past year has been predicated on dividend safety. Management has repeatedly expressed confidence that there are no circumstances under which the dividend would be cut, short of the unlikely event of substantial tenant foreclosures. However, the company found itself in a position this quarter whereby it had not completed refinancing of a major debt maturity coming due October 31. The unsettled outcome of the maturity and management's resulting inability to put the dividend declaration before the board places enough evidence in front of us that the dividend is more at risk than previously acknowledged.

*Id.* ¶ 56; J.A. 132. On November 17, 1999, during the regular quarterly conference call with analysts and interested investors, Prime Retail's management reiterated their commitment to continuing to pay dividends. A J.P. Morgan analyst report dated November 18, 1999, summarized the conference call as follows:

> Management is fully committed to $1.18 dividend. There were a number of questions on the conference call related

> to whether PRT would consider cutting its common divi-
> dend to help fund a share buyback . . . . Management said
> that this is not an option because they feel a "contractual
> obligation" to their shareholders. This position is in line
> with previous statements on dividends and should be reas-
> suring to investors who are attracted to PRT's high yield.

Consol. Am. Compl. ¶ 57. On December 10, 1999, an update report by Fick, which retained his current rating for Prime Retail, noted that "PRT's management repeatedly has stated its commitment to paying its common dividend. However we wonder whether PRT will have the necessary funds to pay the dividend going forward . . . ." *Id.* ¶ 58; J.A. 134.

According to the Appellants, investors began to learn the truth about Prime Retail in mid-January 2000. On January 14, Fick issued a report stating that "even we are surprised" by the results of a Legg Mason "inspection" at some of the company's lower-performing out-let centers, which showed "eroding fundamentals." Consol. Am. Compl. ¶ 62. The report also noted that defendant Michael Reschke (Prime Retail's board chairman) had known about these matters at least since late 1999 from an industry association's letter to him on behalf of tenants complaining about deteriorating conditions at the outlet centers. *Id.* With respect to the dividend, Fick reported that two factors—sufficient cash flow and "management's absolute commit-ment to fully fund its existing dividend"—supported the market's confidence in ongoing dividend payments. "On several occasions management unequivocally stated that it staked its reputation on its commitment to continue to pay the company's dividend." *Id.*

Fick's report of January 14, 2000, had an immediate negative effect on the market price of Prime Retail's stock. On that day (a Friday), the market price dropped from $5.50 to $4.125 per share, a 25% decline, with a trading volume 18 times higher than the company's three-month average. The drop, however, was tempered by the com-pany's strong affirmation that it was properly maintaining its proper-ties, and that it would "decide the fate of the dividend later this month." *Id.* ¶ 63. On the next trading day, January 18, 2000 (a Tues-day after a holiday weekend), Prime Retail announced that it would not pay a dividend for the fourth quarter of 1999. As Prime Retail

would report in its annual report on Form 10-K for 1999, revenues for the fourth quarter of 1999 were only slightly lower than revenues for each of the three previous quarters of 1999. However, FFO and net income were substantially below the earlier quarters' results due to non-recurring charges and expenses of $36,359,000, as well as a loss of $15,153,000 on the sale of real estate.

Prime Retail further advised investors that it believed the company's FFO for the year 2000 would be lower than originally projected, due to "an anticipated decline in occupancy and property level net operating income at a limited number of the Company's outlet centers in the bottom quartile of its portfolio." The market price of the company's shares dropped another 37%, to close at $2.625. *Id.* ¶ 64.

Later in the year, most of the company's officers left or were terminated by the board, including defendants Rosenthal, Reschke and Mulreany. *Id.* ¶¶ 66, 67. By May 2001, the common stock's market price was only $0.36 per share. *Id.* ¶ 68. Prime Retail's stock was delisted from the New York Stock Exchange in September 2001, and Prime Retail did not pay any dividends in 2000 or 2001.

The Appellants filed a class action suit in the District of Maryland, alleging violations of Sections 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t, and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b5, on behalf of purchasers of Prime Retail's stock between May 28, 1999, and January 18, 2000. The Appellees moved to dismiss pursuant to Rule 12(b)(6) and the heightened pleading standards of the PSLRA, 15 U.S.C. §§ 78u-4(a)-(c). The district court granted the motion. This appeal followed.

## II.

We review dismissals pursuant to Fed. R. Civ. P. 12(b)(6) *de novo*. *Mylan Labs, Inc. v. Markari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The Court presumes that the allegations in the complaint are true, and gives the plaintiff the benefit of every favorable inference that can be drawn from the allegations. *Id.* It is well settled that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of

[the plaintiff's] claim which would entitle [the plaintiff] to relief."
*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (footnote omitted).
Claims brought pursuant to § 10b and Rule 10b-5 are subject to the
heightened pleading standards of the PSLRA. The PSLRA requires,
*inter alia*, that each statement alleged to have been misleading be
identified in the complaint, 15 U.S.C. § 78u-4(b)(1), and that the com-
plaint plead scienter with particularity, *id.* § 78u-4(b)(2).

### III.

The Appellants make two arguments on appeal. First, they argue
that the district court erred in finding the alleged misstatements imma-
terial as a matter of law. Second, the Appellants' argue that the dis-
trict court erred when it held that Prime Retail cannot be held liable
for fraudulent statements made to analysts the company did not con-
trol. We find that binding circuit precedent requires us to hold that the
alleged misstatements were immaterial. We decline to reach the
Appellants' second argument.

The materiality standard for an alleged misrepresentation under
§ 10(b) "is an objective one," and the issue generally presents a ques-
tion of fact involving "the significance of an omitted or misrepre-
sented fact to a reasonable investor." *Gasner v. Bd. of Supervisors*,
103 F.3d 351, 356 (4th Cir. 1996). In *Basic v. Levinson*, 485 U.S. 224
(1988), the Supreme Court set forth the standard for materiality: In
the § 10b context, an omitted fact is material if there is "a substantial
likelihood that the disclosure of the omitted fact would have been
viewed by the reasonable investor as having significantly altered the
'total mix' of information made available." *Id.* at 231-32 (quoting
*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

The district court found that the alleged misstatements made by
Prime Retail did not meet this standard of materiality, based on the
line of circuit precedent starting with *Raab v. General Physics Corp.*,
4 F.3d 286 (4th Cir. 1993). In *Raab*, General Physics, a provider of
personnel training and technical support services to the domestic
nuclear power industry, made the following statement in its annual
report:

> Regulatory changes resulting from [accidents at Three Mile
> Island and Chernobyl], combined with the rising importance

of environmental restoration and waste management, have created a marketplace for the DOE Services Group with an expected annual growth rate of 10% to 30% over the next several years . . . . [T]he DOE Services Group is poised to carry the growth and success of 1991 well into the future.

*Id.* at 289. In a press release that same day, General Physics announced that first quarter earnings for 1992 were likely to be half of analysts' estimates, and also stated that "conditions in the 1st quarter are temporary and that results during the remainder of the 1992 [sic] should be in line with analysts' current projections." *Id.* at 288.

Regarding the alleged misstatements in the annual report, we held:

"Soft," "puffing" statements such as these generally lack materiality because the market price of a share is not inflated by vague statements predicting growth . . . . The whole discussion of growth is plainly by way of loose prediction, and both the range of rates cited, as well as the time for their achievement, are anything but definite. No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market. Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen. The market gives the most credence to those predictions supported by specific statements of fact, and those statements are, of course, actionable if false or misleading. However, "projections of future performance not worded as guarantees are generally not actionable under the federal securities laws." *Krim v. Banctexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993) (citing *Friedman v. Mohasco Corp.*, 929 F.2d 77 (2d Cir. 1991)). Statements such as "the DOE Services Group is poised to carry the growth and success of 1991 well into the future" hardly constitute a guarantee.

*Id.* at 290. And we further held that the statement that future results "should be in line with analysts' current projections . . .[,]" did not "constitute[ ] a guarantee that earnings would be forthcoming in particular amounts . . . ." *Id.* at 291. We rested our decision in *Raab* on

the difference between statements of current facts and forward-looking statements, explaining our view as follows:

> Predictions of future growth stand on a different footing, however, because they will almost always prove to be wrong in hindsight. If a company predicts twenty-five percent growth, that is simply the company's best guess as to how the future will play out. As a statistical matter, twenty percent and thirty percent growth are both nearly as likely as twenty-five. If growth proves less than predicted, buyers will sue; if growth proves greater, sellers will sue. Imposing liability would put companies in a whipsaw, with a lawsuit almost a certainty. Such liability would deter companies from discussing their prospects, and the securities markets would be deprived of the information those predictions offer. We believe that this is contrary to the goal of full disclosure underlying the securities laws, and we decline to endorse it.

*Id.* at 290.

We reaffirmed the reasoning of *Raab* in *Malone v. Microdyne Corp.*, 26 F.3d 471 (4th Cir. 1994), and *Hillson Partners Ltd. P'ship v. Adage Inc.*, 42 F.3d 204 (4th Cir. 1994). In *Malone*, we held that a statement of "comfort" with an analyst's earnings estimate was immaterial as a matter of law, stating: "Misstatements or omissions regarding actual past or present facts are far more likely to be actionable than statements regarding projections of future performance. Generally, the latter will be deemed actionable . . . only if they are supported by specific statements of fact or are worded as guarantees." *Id.* at 479-80. And in *Hillson*, we again applied *Raab* in rejecting as immaterial claims based on a number of forward-looking statements not worded as guarantees or supported by specific facts. 42 F.3d at 21-16 (statements, *inter alia*, that company was "on target toward achieving the most profitable year in its history," that "significant sales gains should be seen as the year progresses," and that a project was "on schedule" were "not material as a matter of law").

Given the background of *Raab* and its progeny, we are constrained to find that the alleged misstatements in this case are immaterial and hence not actionable. The allegedly false forward-looking statements in this case were various permutations of management's expression

of "commitment" to paying the quarterly dividend. Management alternately stated that the dividend was "sacred" or "sacrosanct" or that it "staked its reputation on its commitment to continue to pay the company's dividend." Finally, in response to an analyst's question regarding the possibility of a share buyback, management stated that such a buyback was not an option because its feeling of a "contractual obligation" to continue to pay the current dividend. These projections of future performance are indistinguishable from the statements we held were non-actionable in *Raab*, *Malone*, and *Hillson*. Like the statements alleged to be false in those cases, the statements made by the Appellees are not guarantees and lack the factual specificity necessary to make them actionable in this circuit. Therefore, the statements are immaterial as a matter of law.

We also reject the Appellants' attempt to distinguish *Raab*, *Malone*, and *Hillson* by arguing that Prime Retail's allegedly false statements were statements of present intention to pay dividends, rather than forward-looking projections of future dividends. All projections can be characterized as presently held beliefs. The statements are forward-looking because they relate to "future economic performance." 15 U.S.C. § 78u-5(i)(1)(C). The PSLRA explicitly defines forward-looking statements as including "a projection of . . . dividends," *id.* § 78u-5(i)(1)(A), and any statement relating to such a projection, *id.* § 78u-5(i)(1)(D). Finally, many of the statements in our prior cases could have been characterized as statements of present belief regarding future events. *See, e.g., Hillson*, 42 F.3d at 213-15 (statements that project was "on schedule" and company was "on track" for increased earnings were forward-looking); *Malone*, 26 F.3d at 479-80 (statement of "comfort" with analysts' earnings estimate was forward-looking). Accordingly, our holdings in *Raab*, *Malone*, and *Hillson* are fully applicable in this case. Those cases dictate that the allegedly false statements made by Prime Retail are immaterial as a matter of law.

## IV.

For the above stated reasons, we affirm the district court's dismissal of the Appellants' claims.

*AFFIRMED*