**In re PERITUS SOFTWARE SER-VICES, INC. SECURITIES LITIGATION.**

**No. CIV. A. 98–10578–WGY.**

United States District Court, D. Massachusetts.

June 1, 1999.

Robert Finkel, Wolf Popper Wolf Ross & Jones, Brian Murray, Rabin & Garland, Jonathan M. Plasse, Goodkind, Labaton, Rudoff & Sucharow, LLP, New York, NY, Leo W. Desmond, Law Offices of Leo W. Desmond, West Palm Beach, FL, Frederick W. Gerkens, Wechsler, Harwood, Halebian & Feffer, LLP, New York, NY, Randall Steinmeyer, Reinhardt & Anderson, St. Paul, MN, Nancy F. Gans, Moulton & Gans, LLP, Boston, MA, Stephen Moulton, Moulton & Gans, Boston, Steven Schulman, Paul D. Young, Charles S. Hellman, Milberg, Weiss, Bershad Specthrie & Lerach, Jules Brody, Stull, Stull & Brody, Mark C. Gardy, Abbey Gardy & Squitieri, New York, NY, Thomas G. Shapiro, Shapiro, Grace & Haber, Boston, MA, for Plaintiffs.

John F. Batter, III, Jeffrey B. Rudman, Hale & Dorr, Joseph L. Stanganelli, Hale & Dorr, D. Lloyd Macdonald, Kirkpatrick & Lockhart, Robert J. Muldoon, Jr., Sherin & Lodgen, John C. LaLiberte, Sherin & Lodgen, David A. Brown, Sherin & Lodgen LLP, Peter M. Saparoff, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

### I. Introduction

This securities fraud class action is brought on behalf of all persons (the "Class") who purchased common stock of Peritus Software Services, Inc. ("Peritus") during the time period from October 22, 1997 through October 26, 1998 (the "Class Period") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). The defendants in this action are Peritus and three insiders (collectively, the "Insiders")—Douglas Catalano ("Catalano"), Dominic Chan ("Chan"), and Allen Deary ("Deary"). Each of these parties has moved to dismiss the claims brought against them in the Consolidated Amended Complaint (the "Complaint").

### II. The Allegations

Taking all factual allegations as true, *See Cooperman v. Individual Inc.*, No. 98–1730, 1999 WL 145527, at *3 (1st Cir. Mar. 22, 1999) the following facts appear from the Complaint:

#### A. The Offering

Peritus, a Massachusetts corporation founded in 1991, shifted its business focus in 1995 to products and services that would help customers resolve the so-called "Year

2000 problem." Compl. ¶ 20. Peritus' primary product, a software package known as the Autoenhancer/2000 (the "AE Software"), was released in 1996, generating over six million dollars in revenue from three primary licensees. *See id.* at ¶ 21. This product was only suitable for use and resale by intermediate Year 2000 specialist companies, rather than direct use by "end-user" companies. *See id.* at ¶ 27. On July 3, 1997, Peritus went public through an initial offering (the "Offering") of 4,025,000 shares at $16 per share, a portion of which were sold by the company for net proceeds of approximately $41 million, and a portion of which were sold by company executives and directors for net proceeds of approximately $19.6 million. *See id.* at ¶ 22–23. The remaining approximately nine million shares owned by company executives and directors were subject to a 180–day lockup agreement (the "Lock–Up") at the time of the Offering. *See id.* at ¶ 23.

### B. *Statements Regarding the Market Coverage of Peritus Products and Services*

Peritus frequently touted its product as "user-friendly" and suitable for use by a wide variety of entities across the entire Year 2000 market. *See id.* at ¶ 27. In actuality, however, the AE Software was "intensely technical and could only be operated by high-level programmers and not by the average IT personnel at the majority of end user companies." *Id.* The AE Software also could only be operated on a costly computer processor, a requirement making the software unsuitable for the majority of end user companies. *See id.* Moreover, even when an outsourcing company acted as an intermediary or a "value added integrator," the software required costly interaction between the outsourcing company and programmers at the end user company. *See id.* For all of these reasons, "[t]he AE Software was only suitable for use by a relatively small number of organizations with extremely high volumes of code to be renovated." *Id.* In contrast, by the middle of 1997, competi-

tors to Peritus had developed products which could be operated by lower level IT personnel on common computer systems at a much lower price. *See id.* Moreover, Peritus knew that the demand for value added integrator services was also rapidly declining. For instance, Datamatics, one of Peritus' value added integrator customers, had conducted a telemarketing survey from September 1997 to November 1997 which revealed that "only a small percentage of entities contacted were interested in outsourcing their Year 2000 renovation projects," a fact that Dramatics relayed to Peritus. *Id.* at ¶ 37. Thus, when, on several occasions, Peritus or its officers touted the versatility of its product or cited the "enormous need" and "unprecedented market demand" that AE Software satisfied, *id.* at ¶¶ 31, 36, the statements were materially misleading, in the Class' view.

### C. *Accounting Statements*

During the Class period, Peritus issued a number of accounting statements and press releases regarding its third and fourth quarter results of 1997 and first and second quarter results of 1998. *See id.* at ¶¶ 28–29, 34–35, 44–45, 52–53, 55–56, 57–58, 60–61, 62–64. These statements are challenged by the Class as false and misleading because each "materially overstated [Peritus'] revenue and thus its net income and earnings per share." *Id.* at ¶ 29. This inference is supported by several allegations. First, Peritus improperly recognized revenue on "fictitious licenses and/or prior to the shipment of Peritus" products. *Id.* at ¶ 82. For example, in a Form 8–K filed on or about December 4, 1998, Peritus disclosed that the software associated with a $600,000 transaction that was reported in the fourth quarter of 1997 was not actually shipped until 1998, and that the revenue now appeared uncollectible. *See id.* at 87. In the same Form, Peritus also reported that an earlier recognized sale of $1.1 million had been based on a miscommunication with the customer, and that in actuality "no license revenue

should have been recorded." *Id.* at ¶ 90. These facts render misleading Pertitus' statement that "[r]evenue from end-user licenses is recognized when ... software and methodologies have been delivered ...." *Id.* at ¶ 81. Second, Peritus failed to disclose certain material facts regarding the limitations on the use and market for the AE Software. *See supra* Section II.B. Third, "[b]y mid–1997 it was apparent to defendants that substantially fewer organizations were outsourcing their Year 2000 renovations than earlier industry figures indicated." Compl. ¶ 30(b). Thus, because Peritus knew "that the AE Software was only rarely suitable for direct use by end user companies performing their own year 2000 remediation," *id.*, it also knew that the market for its product was diminishing. Fourth, Peritus created the false impression that its new licensing program was the cause of increased revenue, when in fact the program was a contingency fee program only and did not secure any financial commitment from the licensees. *See id.* at ¶ 30(c). Indeed, many of the Peritus licensees had never used the AE Software and therefore generated no revenue for Peritus. *See id.* Fifth, Peritus had engaged in drastic pricing maneuvers by the end of the fourth quarter of 1997, offering deep discounts to licensees if they would agree to pay fees in advance. *See id.* at ¶ 39(c). Finally, Peritus also backdated several contracts signed in January 1998, including one with Zale Corporation, in order to have the revenue reported in 1997. *See id.* at ¶ 45(e).

### D. Statements Regarding the Acquisition of Millennium Dynamics, Inc.

In an October 22, 1997 press release, Peritus announced that it had signed an agreement to acquire Millennium Dynamics, Inc. ("Millennium"). *See id.* at ¶ 31. A number of statements contained in that press release and in later disclosures were false and misleading because: (1) Peritus represented that it licensed its AE Software directly to end users when in fact the software was too complex for such users,

*see id.* at ¶ 32; (2) Peritus represented that its sales force would "fit well" with Millennium's when in fact the two companies employed vastly different sales techniques that required their sales forces to compete with each other rather than cooperate, *see id.* at ¶ 33; (3) Peritus represented that the two companies had "already begun to work together" when in fact large numbers of the Millennium sales force resigned immediately following the merger, *see id.* at ¶¶ 38–39; and (4) in a January 27, 1998 press release, Peritus stated that the Millennium acquisition "has been a success," when in fact Peritus had lost most of the Millennium sales force and had virtually stopped selling Millennium products, *see id.* at ¶¶ 44–45.

Later, in an April 23, 1998 press release, Catalano admitted that the Millennium acquisition had caused internal problems, attributing Peritus' "lower license revenue, primarily [to] sales force integration issues." *Id.* at ¶ 59. Moreover, the company took a $4,294,000 write-down in the third quarter of 1998 related to Peritus' Millennium assets. *See id.* at ¶ 68.

### E. Analyst Statements

The Class also makes a variety of allegations regarding statements made by two different securities analysts. *See id.* at ¶¶ 40–41, 46–47. The Class alleges that Peritus embroiled itself into a network of communications with analysts for the ultimate purpose of disseminating false and misleading information to the market. Thus, the Class seeks to hold Peritus and the Insiders responsible for the statements contained in the analysts' reports.

### F. The Fallout

On February 11, 1998, just weeks after the Lock–Up had ended, Chan, Catalano, and Deary sold 150,000, 80,000, and 60,000 shares, respectively, of Peritus stock. *See id.* at ¶ 48. Other corporate executives and directors also moved quickly to sell shares. *See id.* at ¶ 49. The Class alleges

that these stock sales were "unusual in timing and amount." *Id.* at ¶ 97. On March 20, 1998, analysts at Montgomery Securities downgraded Peritus from a "buy" to a "hold," causing the stock price to immediately shed some thirty-one percent of its value. *See id.* at ¶¶ 50–51. Ten days later, Peritus announced that it would take a significant restructuring charge in the wake of significant losses. *See id.* at ¶ 52. This announcement caused the price of Peritus' stock to drop further, recording a low of $5.44 for the day's trading session, some eighty percent lower than the high of $28.50 for the Class Period. *See id.* at ¶ 54. In late 1998, Peritus significantly restated its income for the previous four quarters. On October 26, 1998, Peritus issued a press release announcing that it would restate financial results for the first and second quarters of 1998, reducing reported revenue from $10.150 million to $9.453 million, and from $11.83 million to $11.083 million, respectively. *See id.* at ¶ 66. On November 25, 1998, Peritus issued a press release announcing that it would restate its financial results for the third and fourth quarters of 1997, excluding from revenue $1.2 million and $600,000, respectively. *See id.* at ¶ 67. Peritus' stock price closed at $0.94 per share on October 26, 1998, and $0.63 per share on November 25, 1998. *See id.* at ¶ 70. Finally, on December 14, 1998 the company filed a Form 10–Q for the third quarter of 1998 in which Peritus stated that it had "doubt about its ability to continue as a going concern after 1998." *Id.* at ¶ 68.

## III. *Analysis*

### A. *The Standard of Review*

In reviewing a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all well-pleaded allegations and give plaintiffs the benefit of all reasonable inferences." *Cooperman,* 171 F.3d at 48. The Court may grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus.,* 814 F.2d 22, 25 (1st Cir. 1987) (*quoting Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 [1957]).

In a securities action, two additional considerations bear upon the motion to dismiss: Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). Rule 9(b) imposes a heightened pleading requirement on plaintiffs alleging fraud: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). Likewise, under the PSLRA a complaint alleging securities fraud must set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In addition, in order sufficiently to allege scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). When a complaint fails to meet the above two requirements, dismissal is required. *See* 15 U.S.C. § 78u–4(b)(3)(A).

"Such heightened scrutiny is hardly new to this Circuit, which traditionally has set the bar for securities plaintiffs quite high under Rule 9(b)." *Lirette v. Shiva,* 27 F.Supp.2d 268, 275 (D.Mass.1998); *accord, e.g., Gross v. Summa Four, Inc.,* 93 F.3d 987, 991 (1st Cir.1996) ("We have been especially strict in demanding adherence to Rule 9[b] in the securities context . . . ."); *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991) ("We have been especially rigorous in demanding such factual support in the securities context . . . ."). To properly support an allegation of fraud, pleadings must go beyond mere information and belief to specify the source of the information and

the reasons for the belief. *See Romani,* 929 F.2d at 878. Thus, a complaint alleging fraud must specify (1) the statements that the plaintiff contends were fraudulent, (2) the identity of the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See Suna v. Bailey Corp.,* 107 F.3d 64, 68 (1st Cir.1997) (*citing Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127–28 [2d Cir.1994] ).

■ "Furthermore, as to scienter, the courts of this Circuit already require a securities plaintiff 'to allege facts that give rise to a strong inference of fraudulent intent.' " *Shiva,* 27 F.Supp.2d at 275 (*quoting Suna,* 107 F.3d at 68) (citations and internal quotation marks omitted). A securities plaintiff must allege "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Greenstone v. Cambex Corp.,* 975 F.2d 22, 25 (1st Cir.1992). The First Circuit has noted that "we do not interpret the [PSLRA] standard to differ from that which this court has historically applied." *Maldonado v. Dominguez,* 137 F.3d 1, 9 n. 5 (1st Cir.1998) (*citing Greenstone,* 975 F.2d at 22).

B. *Statements Regarding the Market Coverage of Peritus Products and Services*

The Class challenges a number of statements relating to the "user friendly" nature of the AE Software and the "enormous need" and "unprecedented market demand" that Peritus products and services satisfy. These statements are grouped according to subject matter and addressed accordingly.[1]

1. *Statements Regarding Market Demand*

The Class objects to Peritus' December 2, 1997 claim that the company was experiencing "unprecedented market demand for [its] products and services." Comp. at ¶ 36. According to the Class, this statement was false when made because "the market for Peritus' principal product, the AE Software, was floundering, forcing defendants to offer significant discounts in an effort to generate revenue." Opp. at 15. Similarly, on January 27, 1998, Catalano stated that "[w]e are extremely proud of our success and our focus on near and long term opportunities in the software evolution market place." Compl. at ¶ 44. By the beginning of 1998, however, sales of both the AE Software and the product acquired from Millennium "were virtually nonexistent." *Id.* at ¶¶ 39(c), 45(c). In the Class' view, "[u]nder the circumstances, for defendants to state that their efforts had been a 'success' was materially false." Opp. at 16.

■ The first statement must be addressed in its full context. *See Shaw,* 82 F.3d at 1220 ("In deciding a motion to dismiss a securities action, a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint."). Set forth in a press release dated December 2, 1997, and entitled "Peritus Announces Availability of Year 2000 Renovation Services for RPG, PL/I, and COBOL Environments," the statement was surrounded by the following description of Peritus' services:

> Peritus Software Services, Inc. . . . , a leading supplier of Year 2000 services and technologies, today announced the availability of Automate:2000 Renovation Services for RPG, PL/I, and COBOL. The Automate:2000 service employs the AutoEnhancer/2000 family of products and addresses the corrective phase of a Year 2000 project, providing high-quali-

---

1. The Class objects to "an atomistic analysis of each sentence and phrase of [the alleged] false and misleading statements." Opp. at 14. At least in this Circuit, however, "[c]ase after 10b–5 case has been decided by a state- ment-by-statement analysis in which the inquiry made is restricted to the immediate context of each statement." *In re Boston Tech. Inc. Sec. Litig.,* 8 F.Supp.2d 43, 55 (D.Mass.1998) (Lasker, J.).

ty, automation-assisted renovations to clients and service providers.

The Automate:2000 Renovation Services for RPG, PL/I, and COBOL are now available directly from Peritus for those clients and service partners who choose to outsource code renovations. "Peritus offers both software maintenance Outsourcing services and industry-leading Year 2000 products," stated Bill Sawyer, Vice President of Client Operations. "It is only natural that we should respond to the unprecedented market demand for our products and services by offering clients the best of both worlds. We are pleased to announce the availability of Year 2000 renovation services, and will continue to set the standard for other Year 2000 vendors in meeting the demands of clients in various environments."

Def. J.A. Ex. M at 1. The "unprecedented market demand" statement, placed in context, represents precisely the type of "rosy affirmation" which the First Circuit has held to be mere corporate puffery. *See Shaw,* 82 F.3d at 1217 ("[C]ourts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available."). Although ordinarily applied to optimistic forward-looking statements, "[t]he [corporate puffery] rule covers loose optimism about both an issuer's current state of affairs and its future prospects." *In re Boston Tech.,* 8 F.Supp.2d at 54. In this case, Peritus was announcing the availability of a new type of service that it could offer clients. Citing an "unprecedented market demand" for Peritus offerings was simply part and

parcel of the standard corporate hyperbole that accompanies any new product or service announcement. *See Glassman,* 90 F.3d at 635–36 (dismissing claim based on statement that issuer expected new product "to broaden the number of customers in existing accounts as well as attract new customers"); *Simon v. American Power Conversion Corp.,* 945 F.Supp. 416, 428–29 (D.R.I.1996) (expectation that "1995 [is going] to be a busy year" was immaterial sales talk); *id.* at 428 (statement recognizing "significance of newly emerging international markets and the vast potential for [defendant's] products in these areas of the world" was "little more than corporate cheerleading").

■ The second challenged statement—that "[w]e [at Peritus] are extremely proud of our success and our focus on near and long term opportunities in the software evolution market place"—also represents nonactionable corporate puffery. No reasonable investor would take a statement that corporate executives were "proud" of their accomplishments as anything more than a wholly *subjective* view. As such, the statement cannot have been material under any sensible analysis of corporate prospects.[2]

### 2. Statements Regarding Successful Marketing Efforts

On October 22, 1997, Catalano stated in a press release:

Our value added integrators have acquired additional Line of Code usage based licenses which is an indication that they are experiencing increased demand and throughput in their factories.

Compl. at ¶ 28. Additionally, Peritus stated that the AE Software had become "a leading choice" for the value added integrators, *id.* at ¶ 31, that the company's products were "in use by more clients than any other renovation tools," *id.* at ¶ 36, and that "clients can easily leverage [Peritus']

---

**2.** Moreover, it is difficult to see how the Class could ever successfully show that the Insiders intentionally or recklessly misled investors re-

garding the fact that they were subjectively "proud" of their company.

combined product suites in addressing their Year 2000 issues," *id.* at ¶ 45. The Class claims that these statements were misleading because the value added integrators were not seeing the demand they expected for outsourcing of Year 2000 compliance work, and because the AE Software was unattractive even to value added integrators due to its complexity. *See* Opp. at 16.

 Several of these statements may be quickly addressed. First, the statement that Peritus is a "leading choice" among value added integrators is not rendered false or misleading by the Class' allegation that value added integrators experienced reduced demand for *their* services. A firm may still offer the "leading choice" among resellers even if demand is down among the ultimate consumers. Thus, for this particular statement, the Class has failed to specify "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b). Second, the statement that Peritus products were "in use by more clients than any other renovation tools" must be placed in full context: "Together, the Autoenhancer/2000 and Vantage YR2000 products are in use by more clients than any other renovation tools." Compl. at ¶ 36. The factual import of this statement as it relates to the *combined* use of Peritus and Millennium products has not been challenged by the Class, and thus the Class has again failed to specify "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b). Finally, the statement that "clients can easily leverage [Peritus'] combined product suites in addressing their Year 2000 issues" is also not rendered false or misleading by any of the factual allegations brought by the Class. Even if there was significant softening in the market for Peritus products and services, that does not negate the fact that the unwanted products and services *could* address Year 2000 issues. The Class has criticized the AE Software on a number of grounds, but it has not claimed that the software was inoperable.

 The remaining statement—that "[o]ur value added integrators have acquired additional Line of Code usage based licenses which is an indication that they are experiencing increased demand and throughput in their factories"—is challenged as misleading because the Class alleges that value added integrators were not seeing increased demand. Indeed, the Class alleges that Datamatics, one of Peritus' value added integrator customers, had conducted a telemarketing survey from September, 1997 to November, 1997 which revealed that "only a small percentage of entities contacted were interested in outsourcing their Year 2000 renovation projects," a fact that Dramatics relayed to Peritus. Compl. at ¶ 37(c). What Datamatics relayed to Peritus in November, 1997, however, cannot be used to render misleading a statement by Peritus made on October 22, 1997. Moreover, the Class simply has not challenged the primary factual import of the October 22 statement; namely, that Peritus' value added integrators had "acquired additional Line of Code usage based licenses." The acquisition of additional "usage based licenses" is not necessarily inconsistent with an overall decline in the market for value added integrator services. Thus, without contravening the essential meaning of the statement, the Class has failed sufficiently to allege *why* the statement is misleading. *See Gross*, 93 F.3d at 992 (duty of disclosure "does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, marketwise") (citation omitted).

### 3. *Statements Regarding "End Users"*

 Finally, the Class challenges a statement contained in an October 22, 1997 press release in which Peritus represented that it "license[d][its] software directly to end users." Compl. at ¶ 32. In the Class' view, this statement was "materially misleading because defendants knew that the AE Software was an extremely complex

product that was unsuitable for use by the vast majority of end users." Opp. at 18.

The same press release that contained the challenged statement also contained the following language which more specifically addressed the topic raised by the Class:

> "In addition to the dedicated factory solution *which is Peritus' strength,* there is an enormous need for tools that can coexist on a client's mainframe and enable in-house IT managers to apply their domain knowledge and manpower to solving the Year 2000 problem," said Dominic Chan, Chairman of the Board at Peritus. *"That is exactly the market that Millennium Dynamics addresses so well."*

Def. J.A., Ex. L (emphasis added). This more specific statement renders the "end user" language immaterial as matter of law. The very fact complained of by the class—that the AE Software was not suitable for end users—was admitted by Peritus in the quoted statement from the press release as a primary reason for acquiring Millennium. By contrast, the "end user" phrase challenged by the Class was buried in the concluding section of the press release, a largely generic description of the company entitled, "About Peritus." *Id.*

The Class argues that when a company voluntarily chooses to make a statement "reasonably calculated to influence the investing public, it has a duty to disclose sufficient information so that the statement made is not false or misleading or ... so incomplete as to mislead." *Levinson v. Basic, Inc.,* 786 F.2d 741, 746 (6th Cir.1986), *rev'd on other grounds,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Peritus' specific statements regarding its limitations in the end user market and need to acquire Millennium satisfied that

duty of disclosure. Thus, the Court rules that the challenged phrase, when placed in context of the entire press release, is non-actionable. *See Shaw,* 82 F.3d at 1213 ("[I]f a statement is couched in or accompanied by prominent cautionary language that clearly disclaims or discounts the drawing of a particular inference, any claim that the statement was materially misleading because it gave rise to that very inference may fail as a matter of law.").

### C. *Accounting Statements*

#### 1. *Materiality*

■ The Class challenges as misleading eight statements that contain representations regarding Peritus' financial results for the four quarters that were eventually restated downward. Each of these statements were allegedly misleading due to Peritus' practice of improperly recognizing revenue. Specifically, Peritus "improperly recognized revenue on fictitious licenses and/or prior to the shipment of Peritus licenses during the Class Period." Compl. at ¶ 82. For example, Peritus recognized and reported $1.2 million of software licensing revenue for the quarter ended September 30, 1997, even though the Company did not ship the software to its customer during the quarter. *See id.* at ¶ 83. Additionally, Peritus admitted in a Form 8–K filed on or about December 4, 1998 that it had reported income of $600,000 on a transaction during the fourth quarter of 1997 that should not have been recorded at all, in any quarter. *See id.* at ¶ 87. Practices such as these resulted in the improper recognition of revenue, eventually necessitating the drastic income restatements that occurred in late 1998.[3]

---

**3.** The Class adds other allegations: (a) that the "Powered by Peritus" licensing program required no financial commitment from licensees and therefore could not have caused increased revenues, *see* Compl. at ¶ 30(c); (b) that Peritus had resorted to "deep discounts" in order to induce licensees to pay fees up-

front so that Peritus could recognize revenue, *see id.* at ¶ 39(c); (c) that Peritus included Millennium license revenue in its report for the fourth quarter of 1997, *see id.* at ¶ 45(d); and (d) that Peritus back-dated several contracts in order to recognize revenue in an earlier quarter, *see id.* at ¶ 45(e). These alle-

The primary evidence proffered by the Class in support of their allegations of improper revenue recognition comes in the form of Peritus' later corrective accounting action. Because it is able to cite the particular transactions that were disclosed by Peritus in its SEC filings, the Class appears to survive the initial hurdle of alleging particular facts to show why a representation was materially misleading. *See Shiva,* 27 F.Supp.2d at 278 (noting that "[t]o adequately plead financial fraud based on improper revenue recognition, Plaintiffs must allege, at a minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, the terms of specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions") (quoting *In re Oak Tech. Sec. Litig.,* No. 96–20552 SW, 1997 WL 448168, at *8 [N.D. Cal. Aug. 1, 1997] ). Given the specificity with which Peritus later disclosed the two transactions that it revised, the Court holds that the Class has sufficiently alleged *why* the accounting statements were materially misleading.

### 2. Scienter

While these after-the-fact accounting admissions may suffice to show that material misstatements occurred in the financial statements, they do not by themselves suffice to show that the misstatements occurred knowingly or recklessly. *See Gross,* 93 F.3d at 991 ("[W]e have consistently held that a securities plaintiff does not satisfy the requirements of Rule 9[b] merely by pleading 'fraud by hindsight.' "); *Shaw,* 82 F.3d at 1223 ("We have emphasized that the particularity requirement cannot be avoided 'simply through a general averment that defendants "knew" earlier what later turned out badly.' ") (quoting *Greenstone,* 975 F.2d at 25; *In re Viewlogic Sys.,* slip. op. at 14–15 (plaintiffs cannot "use disclosures after the date of the statement to show that the company knew that problems existed at the earlier date and should have disclosed them")). A host of courts have held that a mere failure to recognize revenue in accordance with GAAP does not, in itself, suffice to establish scienter. *See, e.g., Chill v. General Elec. Co.,* 101 F.3d 263, 270 (2d Cir.1996); *In re Software Toolworks Inc. Sec. Litig.,* 50 F.3d 615, 627 (9th Cir.1994); *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 362 (1st Cir.1994); *Adams v. Standard Knitting Mills, Inc.,* 623 F.2d 422, 432 (6th Cir.); *Greebel v. FTP Software,* 182 F.R.D. 370, 374 (D.Mass.1998) (Tauro, C.J.).

The Class cites *Malone v. Microdyne Corp.,* 26 F.3d 471 (4th Cir.1994), for the proposition that the sheer nature of certain accounting violations can suffice to

gations may be dismissed quickly. First, Peritus claimed only that it "added three new value added integrators to [its] 'Powered by Peritus' program,' " *id.* at ¶ 28, *not* that the program caused increased revenue. *See Capri Optics Profit Sharing v. Digital Equip. Corp.,* 950 F.2d 5, 11 (1st Cir.1991) (noting that statements must be understood "in the context in which they are made"). Second, " 'pull-ins' [or 'deep discounts'] are not the nefariously manipulative scheme that plaintiffs make them out to be. 'Pull-ins' do not result in the improper recognition of revenue under generally accepted accounting principles ["GAAP"]. They are actual sales which are treated no differently than any other sale . . . ." *In re Viewlogic Sys. Sec. Litig.,* No. 95–10014–DPW, slip. op. at 5 n. 3 (D.Mass. Mar. 13, 1996) (Woodlock, J.) (quoting *In re Cypress Semiconductor Sec. Litig.,* 891 F.Supp.

1369, 1381 [N.D. Cal.1995] ). Third, Peritus was both candid about and entitled to include Millennium revenue in its sales figures. *See* March 31, 1998 Form 10–K at 51 (quoted in Def. Mem. at 8 n.10) ("[T]he results of the operations of [Millennium] . . . have been included in the Company's financial statements since the effective date of the acquisition."). Finally, the allegation that Peritus back-dated contracts in order to recognize revenue early lacks a sufficiently particular factual predicate. Stating that unspecified "[d]efendants . . . back-dated several contracts signed in January 1998, including a contract with Zale Corporation" fails to satisfy the requirement that "the particular times, dates, places, or other details of the alleged fraudulent involvement of the actors be alleged." *Gross,* 93 F.3d at 991.

establish a strong inference of scienter. *See id.* at 478 ("We cannot find a single precedent . . . holding that a company may violate FAS 48 and substantially overstate its revenues by reporting consignment transactions as sales without running afoul of Rule 10b–5."). The *Malone* court, however, was addressing whether a violation of FAS 48 would amount to a *material* misstatement, not whether such a violation would automatically show a knowing or reckless misstatement. As noted above, the Court rules that the accounting statements *were* materially misleading inasmuch as they incorporated the transactions that were later reversed. Whether they were knowingly or recklessly misleading, however, is an altogether separate question.[4]

Thus, the mere fact that Peritus voluntarily restated income in late 1998 does not, standing alone, support a "strong inference" that Peritus knowingly or recklessly misreported income in the third and fourth quarters of 1997 and first and second quarters of 1998. Instead, the Court must ask whether the GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that the defendants knowingly or recklessly misled investors.

■■■■ In support of this inference, the Class offers evidence of insider trading. The allegations, however, suffer from the same defect as those at issue in *Shiva;* namely, a failure to allege particular facts showing that the trading conducted by the insiders was unusual in amount or kind. Allegations of unusual insider trading by a defendant during the class period can support a strong inference of scienter. *See Serabian,* 24 F.3d at 368. "[The Class], however, bears the burden of showing that sales by insiders were in fact unusual or suspicious in amount or timing." *Shiva,* 27 F.Supp.2d at 283 (citing *In re Glenayre Tech., Inc. Sec. Litig.,* 982 F.Supp. 294, 298–99 [S.D.N.Y.1997]). One fact necessary to a showing of unusualness is the amount of trading that the insider conducted before or after the class period. *See id.* at 283 (citing *Greebel,* 182 F.R.D. 370; *In re Chipcom Corp. Sec. Litig.,* No. 95–11114, 1996 WL 1057531, slip. op. at 36 [D. Mass. Apr. 29, 1996] [Woodlock, J.]).

■■■■ In this case, the Class has alleged only that insider trading occurred, not that it was unusual or suspicious. "Of course, the mere fact that insider stock sales occurred does not suffice to establish scienter." *Shaw,* 82 F.3d at 1224. The Class concedes that Chan and Deary sold 500,000 and 50,000 shares of stock, respectively, in the Offering. *See* Compl. at ¶ 23. Thus, Chan's and Deary's February 1998 sales of 150,000 shares and 60,000 shares, respectively, are not out of line with past trading history.[5] Moreover, all of the chal-

---

**4.** The Class cites other cases for the proposition that "incidents of improper revenue recognition . . . under the circumstances, give rise to a strong inference of scienter." Opp. at 7–8. Three of these cases are distinguishable for the simple reason that they did not apply the stringent "strong inference" standard adopted by the First Circuit. *See Provenz v. Miller,* 102 F.3d 1478, 1490 (9th Cir. 1996) ("Summary judgment on the scienter issue is appropriate only where there is no rational basis in the record for concluding that any of the challenged statements was made with requisite scienter.") (internal quotations omitted); *In re Discovery Zone Sec. Litig.,* 943 F.Supp. 924, 937 (N.D.Ill.1996) ("Unlike the factual circumstances constituting the fraud, a defendant's fraudulent intent may be averred generally."); *In re Chambers*

*Dev. Sec. Litig.,* 848 F.Supp. 602, 620 (W.D.Pa.1994) ("Scienter ['malice, intent, knowledge and other condition of mind'] is explicitly permitted to be averred generally by Rule 9[b]."). The final case cited by the Class, *Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246 (N.D.Ill.1997), appears not to contradict the standard adopted by this Court. *See id.* at 1255 (noting that "[a]llegations of a serious departure from GAAP are not by themselves sufficient to give rise to an inference of scienter" and only accepting scienter as well-pled when GAAP violations were combined with two other factors).

**5.** The Class also urges that other Peritus executives, not named as defendants in this suit, sold stock on February 11, 1998 prior to the company's adverse announcements. *See* Opp.

lenged sales occurred "[w]ithin weeks after the lock-up agreement expired," *id.* at ¶ 97, a fact which renders the sales even less suspicious. *See Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1251 (N.D.Cal. 1998) ("[T]he fact that the defendants had not traded before is of no moment whatsoever because the lock-up prevented earlier trades."). Finally, the fact that Chan, Catalano, and Deary respectively retained 94%, 62%, and 75% of their Peritus holdings, *see* Def. J.A. Exs. I–K, suggests that the sales were not unusual or motivated by a desire to capitalize on knowledge of inflated stock values. *See In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117–18 (9th Cir.1989) (relative amount of officer's holding sold is important to question whether sales can support inference of scienter).

▮ Given the fact that the accounting restatements are not determinative, and given the relatively weak evidentiary force of the insider trading allegations, the Court's task becomes essentially that of a drama critic who must answer the following question: Have the Class' well-pled factual allegations *in their entirety* combined to form a narrative compelling enough to allow a "strong inference" of intent on the part of the play's main actors? In other words, are the characters in the Complaint believable? Unlike *Shiva,* in which the plaintiffs' factual allegations rested entirely on information and belief, *see Shiva,* 27 F.Supp.2d at 282, the allegations in this case rest on "interviews with former Peritus sales and marketing personnel." Compl. at ¶ 45. Thus, this is not the easy case in which the Court can fulfill its role as drama critic by simply noting that the curtain never opened. *See*

*Maldonado,* 137 F.3d at 10 ("[I]nformation and belief alone is insufficient to meet 9[b]'s particularity requirement in this context.") (internal quotations omitted). Instead, the Court must view all acts of the play as an afficionado—with attention to detail, openness of mind, and a willingness to be justifiably critical.

The narrative that trickles out of the Complaint is only loosely-formed, with rough character contours and an unforgivably vague plotline. The Class charges that Peritus repeatedly violated GAAP by improperly recognizing revenue at a time when new sales of the Company's software were virtually nonexistent. *See* Compl. at ¶ 39(c). Additionally, the Complaint alleges that:

▶ Peritus licenses with value added integrators were not generating significant revenue due to a downturn in the outsourcing of Year 2000 remediations and the complexity of the AE Software product. *See id.* at ¶¶ 27, 30, 37, 39, 41, 45.

▶ AE Software sales were floundering, causing defendants to offer existing licensees deep discounts in order to raise cash needed to meet analysts' expectations. *See id.* at ¶ 45(d).

▶ Peritus backdated contracts, including one with Zale Corporation, signed in January 1998, in order to have the revenue associated therewith recorded in 1997. *See id.* at ¶ 45(e).

▶ The [Millennium] acquisition had proven unsuccessful, leaving Peritus without a viable [end user]

at 10 (noting that a total of nine Peritus insiders sold nearly 500,000 shares for proceeds in excess of five million dollars). The Class is correct that under *Shaw,* the Court may consider the sales of company insiders not named as defendants. *See Shaw,* 82 F.3d at 1224. The Class must still allege with particularity, however, circumstances showing that those sales were unusual in timing or amount. This the Class has not done. Stat-

ing that the sales occurred "just weeks before" the adverse company announcements is insufficient to raise an inference of knowing exploitation. *See* Opp. at 10. Moreover, the sales were not out of line with prior trading history. *See* Compl. at ¶¶ 22–23 (noting that company executives and insiders sold approximately twenty million dollars worth of Peritus shares during the Offering).

product to market. *See id.* at ¶¶ 39, 41, 45.

Opp. at 8. These facts lack the level of specificity necessary to create a strong inference of intent. We are told that "licenses with value added integrators were not generating significant revenue," that "AE Software sales were floundering," that "[d]efendants backdated contracts," and that the "[Millennium] acquisition had proven unsuccessful." We are not told by how much the acquisition affected sales of Millennium products, who at Peritus backdated contracts, or by how much sales of Peritus products were floundering. We are not told which licensees received offers of deep discounts, who if anyone outside of the Class viewed the AE Software as too complex, or who among the Insiders viewed the Millennium acquisition as unsuccessful.[6] In essence, we are not told "the who, what, when, where, and how: the first paragraph of any newspaper story." *Hemenway v. Peabody Coal Co.,* 159 F.3d 255, 261 (7th Cir.1998) (quoting *Di-Leo v. Ernst & Young,* 901 F.2d 624, 627 [7th Cir.1990] ).

A helpful contrast can be made to the allegations at issue in *Shaw,* which the First Circuit held sufficient to raise a strong inference of scienter. *See Shaw,* 82 F.3d at 1223. In *Shaw,* the First Circuit held that the cumulative weight of suspicious insider trading, a series of detailed factual allegations regarding problems allegedly known to corporate insiders, and "the proximity of the date of the allegedly fraudulent statements and omissions to ... the date on which disclosure was eventually made," *id.* at 1224, sufficed to raise a strong inference of scienter. In the instant case, the Class has only mustered vague factual allegations regarding problems purportedly known to Peritus

and the Insiders. Moreover, the insider trading alleged has not been shown to be suspicious in timing or amount. Finally, the disclosure of accounting errors by Peritus occurred several months after each of the challenged financial statements—a time period far longer than the "less than three week" gap at issue in *Shaw. Id.* at 1200. Thus, especially considering that the First Circuit in *Shaw* felt that "the [scienter] question is close," *id.* at 1223, this Court rules that the instant allegations do not suffice to raise a strong inference of scienter. Simply put, these allegations lack the detail necessary to render it believable that the Insiders knowingly misled investors. A successful narrative requires texture; that is, in order to believe the motives attributed to the story's main characters, the story must be richly drawn. Unfortunately for the Class, the Complaint, with its amorphous allegations of "floundering sales" and "unsuccessful acquisitions," lacks that essential quality.

D. *Statements Regarding the Acquisition of Millennium Dynamics, Inc.*

▮▮▮▮ The Class challenges three positive statements made by Peritus and the Insiders regarding the acquisition of Millennium. These statements were allegedly misleading because: (a) contrary to the representations of Peritus and the Insiders, the two companies' products did not "fit well" and required different sales techniques, *see Compl.* at ¶ 33; (b) large numbers of Millennium sales force left the company shortly after the merger as a result of internal friction, *see id.* at ¶ 39(b); and (c) "by the end of 1997 Peritus had lost most of its [Millennium] sales force and had virtually stopped selling [Millennium] products," *id.* at ¶ 45.[7]

---

**6.** The Complaint does offer specifics regarding the failure of certain license agreements to generate revenue. *See* Compl. at ¶ 30(c). On their own, however, these allegations are insufficient to overcome the vagueness that plagues the remainder of the Complaint.

**7.** The Class also challenges Catalano's statement in the January 27, 1998 Release that Peritus had added thirty-five new customers, claiming that the customers were not new clients but were instead existing Millennium clients. Like the claim that Peritus misstated revenue by including sales generated by Mil-

The first two of these challenged statements, an October 22, 1997 press release and a December 3, 1997 press release, are nonactionable as matter of law because they occurred one and a half months before and two days after the acquisition, respectively. As such, the Class cannot contend that it has pleaded (or could plead) factual allegations sufficient to give rise to a strong inference that Peritus and the Insiders knew that the merger did not "fit well," that members of the sales force would leave after the merger, or that the company would stop selling Millennium products "by the end of 1997." The securities laws mandate disclosure—not clairvoyance.[8]

The third statement (the "January 27, 1998 Release") presents a more substantial claim as it represents a statement made contemporaneously to the factual allegations that purportedly rendered the statement misleading. It read as follows:

"The acquisition and integration of [Millennium] has been a success," said Deary ... "In addition to the strong financial results, we are pleased to see that clients have purchased the combined AutoEnhancer/2000 and Vantage YR2000 product suites. This confirms our belief that clients can easily leverage the combined product suites in addressing their Year 2000 issues."

Catalano stated, "We have completed a successful IPO, doubled our revenue from the previous year, completed the [Millennium] acquisition and significantly increased earnings .... We are extremely proud of our success and our focus on near and long term opportunities in the software evolution market place .... In the fourth quarter alone,

Peritus added 35 significant new clients ...."

*Id.* at ¶ 44 (the "January 27, 1998 Release"). The Class claims that Peritus should not have stated that the merger was a "success" because the companies did not "fit well," large numbers of Millennium sales force had left Peritus, and by the end of 1997, Peritus had stopped selling Millennium products. The defendants argue that the January 27, 1998 Release should be held nonactionable because the allegations supporting its misleading nature are "too absurd to be taken at face value." Peritus Mem. at 20. For instance, Peritus argues that the Class' allegation regarding cessation of Millennium product sales should be ignored because it represents "fraud by hindsight" pleading impermissible under controlling law. Peritus disclosed almost one year after the date contended by the Class that Peritus "plan[s] to stop development of all existing and in-process products originally acquired from [Millennium]." Third Quarter 1998 Form 10–Q at 10 (quoted in Compl. at 68). Were the Class' allegations premised solely on "information and belief," Peritus would be correct: the mere fact that Peritus admitted a plan to stop sales of Millennium products in late 1998 cannot support an inference that Peritus had stopped selling one year earlier, in late 1997. Because the Class has based its allegations on "interviews with former Peritus sales and marketing personnel," Compl. at ¶ 45, however, a different standard applies. The allegations offered to show why a particular statement is false or misleading must be accepted as true even without a supporting factual predicate when based on something *other than* information and belief. That is, the heightened standard of the PSLRA only attaches when allegations

---

lennium products, this claim fails because it is not materially misleading for Peritus to include figures attributable to Millennium in discussing its own results. Indeed, that is a primary purpose of merging.

8. Moreover, even if Peritus and the Insiders were put to a burden of extrasensory percep-

tion, the challenged statements would still be nonactionable as matter of law because they constitute forward-looking corporate puffery that no reasonable investor would consider important to the total mix of information. *See Shaw,* 82 F.3d at 1217.

are based on information and belief: "[I]f an allegation regarding [a] statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

A similar issue resurfaces, this time in less favorable fashion for the Class, when one turns to the question of scienter. Under the PSLRA, in order sufficiently to allege scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). In this Circuit, the required state of mind is knowing or reckless. *See Shiva*, 27 F.Supp.2d at 282. The Complaint alleges several general statements regarding scienter. *See, e.g.*, Compl. at ¶ 17 ("Because of their board membership and/or executive and managerial positions with Peritus, the Individual Defendants had access to the adverse nonpublic information."); *id.* at ¶ 110 ("The Individual Defendants, through their positions as directors and officers of the Company, had actual knowledge of the material omissions and/or the falsity of the statements set forth above, and intended to deceive plaintiffs, and the other members of the Class or, in the alternative, acted with reckless disregard for the truth when they failed or refused to ascertain and disclose in the aforementioned documents the true facts . . . ."). Such "[g]eneral allusions to unspecified internal corporate information are insufficient to withstand a motion to dismiss." *Shiva*, 27 F.Supp.2d at 283. Thus, without more, the Complaint fails to allege sufficient facts to raise a strong inference that the relevant speakers knew, at the time of speaking, that their statements were false or misleading. *See Zeid v. Kimberley*, 973 F.Supp. 910, 924–25 (N.D.Ca.1997) (ruling that allegations of access to internal documents by executives do not amount to contemporaneous facts showing that defendants knew their misleading statements were false when made and thus are insufficient under the PSLRA).

The Class does offer two allegations of scienter that are more specific than those just rejected:

> According to former Peritus sales and marketing personnel, internally, defendants discussed that they had paid too much for [Millennium] and that there were major problems with the acquisition. Compl. at ¶ 39(b).

> In contradiction to defendant Deary's statements in the January 27, 1998 press release that "the acquisition and integration of [Millennium] ha[d] been a success," defendant Catalano, in the April 23, 1998 press release, attributed Peritus's "lower license revenue, primarily [to] sales force integration issues." *Id.* at ¶ 59.

The first of these allegations fails to achieve the level of specificity required by the First Circuit and the PSLRA. Stating that unnamed "defendants" discussed "major problems with the acquisition," does not raise a strong inference that Deary knew of the misleading nature of his statement at the time it was made. The second of these allegations also poses conceptual difficulties for the Class. The Court is asked to rule, based on Catalano's statement regarding "sales force integration issues," that Deary's view of the merger as a "success" was misleading when made some three months earlier. The cases show, however, that the Class cannot "use disclosures made after the date of the statement to show that the company knew that problems existed at the earlier date and should have disclosed them." *In re View-logic Sys.*, slip. op. at 14–15; *see also Gross*, 93 F.3d at 991; *Shaw*, 82 F.3d at 1223.

Finally, the Class claims to have alleged a sufficient factual predicate to show scienter with respect to *certain* of the alleged reasons why the "success" statement was misleading. Specifically, the Class argues that these certain alleged reasons are of such a nature that, when accepted as true, scienter inevitably follows inasmuch as senior executives at Peri-

tus would have been reckless as matter of law to ignore them. For instance, the shedding of sales staff alleged in the following excerpt would be a corporate event of which senior executives would either have knowledge or would be reckless to not have knowledge:

> According to former Peritus sales and marketing personnel, as a result of internal friction, large numbers of the [Millennium] sales force resigned immediately following completion of the merger. Moreover, ... the existing Peritus sales force was unable to successfully replicate [Millennium's] sales techniques.

Compl. at ¶ 39(b). The Class' argument must fail. The First Circuit has clearly held that "[e]ven if plaintiffs wish to prove scienter by 'recklessness,' they still must allege, with sufficient particularity, that defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *Maldonado*, 137 F.3d at 9 n. 4. That is, "the pleading of scienter may not rest on a bare inference that a defendant must have had knowledge of the facts." *Id.* at 9–10 (internal quotations omitted). In essence, the Class relies on an argument that Deary "must have known" that the sales force integration was problematic and that this issue rendered misleading his statement that the merger was a success. "Unfortunately for the plaintiffs, these are precisely the types of inferences which [the First Circuit], on numerous occasions, has determined to be inadequate to withstand" the special pleading requirements in securities fraud cases. *Id.* at 10.

█ Even if scienter had been shown, however, it is not altogether obvious that the known facts—that sales staff were leaving and that Peritus sales personnel lacked certain skills needed to sell Millennium products—would have rendered the "success" comment *materially* misleading. The "success" comment seems exactly the type of "rosy affirmation" frequently held nonactionable under the corporate puffery doctrine. Indeed, the Tenth Circuit was presented with very similar (though arguably even less "puffing") statements in a securities fraud action:

> We conclude that the following statements were correctly determined by the district court as a matter of law to be immaterial statements of corporate optimism: 1) Frankenberg's statements that Novell had experienced "substantial success" in integrating the sales forces of the two companies, that the merger was moving "faster than we thought," and that the merger presented a "compelling set of opportunities" for the company; and 2) Novell's statements that "[b]y moving rapidly to a fully integrated sales force, we are leveraging our combined knowledge of the expanding scope of network solutions," and that it "expects that network applications will quickly reshape customer expectations." These are the sort of soft, puffing statements, incapable of objective verification, that courts routinely dismiss as vague statements of corporate optimism.

*Grossman v. Novell, Inc.*, 120 F.3d 1112, 1121–22 (10th Cir.1997). Given the compelling factual similarity between the instant case and the Tenth Circuit's *Grossman* decision, the Court rules the merger statements nonactionable, even if a strong inference of scienter were shown.

Thus, the three statements challenged with respect to the success of the merger are nonactionable for the following reasons: the first two because they were made one and a half months before and two days after, respectively, the merger occurred and therefore could not have been made with knowledge or reckless disregard of their false or misleading nature; the third because it is not accompanied by particular allegations sufficient to raise a strong inference of scienter or, alternatively, because the statement constituted a vague positive affirmation upon which no reasonable investor would have relied.

### E. Analyst Statements

The Class also seeks to impose liability on Peritus for various statements made by securities analysts. The majority of courts to address the issue have adopted an "entanglement" test by which a company may be held liable if it has sufficiently entangled itself with the analyst who made the challenged statements. *See In re Number Nine Visual Tech. Corp. Sec. Litig.*, No. 96–11207–WGY, slip op. at 74, 51 F.Supp.2d 1, —— (D.Mass. June 1, 1999); *In re Boston Tech.*, 8 F. Supp.2d at 55 (discussing law of "several Courts of Appeals"). "Courts concluding that an issuer may be liable under the statute for failure to correct an analyst statement have generally required that the plaintiff allege that: (1) the issuer 'entangled' itself in the making of a statement by the analyst; (2) the issuer knew that the statement (commonly a prediction) was false or lacked a reasonable factual basis when made; and (3) the issuer failed to disclose the falsity or the unreasonableness to investors." *In re Boston Tech.*, 8 F.Supp.2d at 55. The First Circuit has yet to rule on the issue of whether a company may be held liable for statements made in analysts' reports. *See Suna*, 107 F.3d at 73. Assuming that the "entanglement" test does apply, the First Circuit has indicated that allegations of entanglement must satisfy the heightened pleading requirements of Rule 9(b). *See id.; see also In re Number Nine Tech.*, No. 96–11207–WGY, slip op. at 74–75, 51 F.Supp.2d at ——; *Shiva*, 27 F.Supp.2d at 280 ("Even assuming . . . that an analyst's statements could be attributed to a company, any allegation that the company made misrepresentations to the analyst must survive the Rule 9(b) standard."); *In re Boston Tech.*, 8 F.Supp.2d at 55 ("Applying the requirements of Rule 9[b] to the law [of 'entanglement'], a plaintiff is required to allege with particularity the time, place, content and speaker of the issuer's communications with the analysts, and explain why the communications were fraudulent.").

Moreover, although the First Circuit has yet to rule on whether a company may be held liable for statements made in analysts' reports, it has provided an example of the level of conduct that does *not* suffice to establish a prima facie case of liability. *See Suna*, 107 F.3d at 73. In *Suna*, the First Circuit rejected the following allegations as insufficient to satisfy the heightened pleading requirements in a securities fraud case, which the Circuit has been "especially rigorous" in applying, *id.*:

> [I]t was the Company's practice to have top managers, namely, Chief Financial Officer Heilman, communicate regularly with securities analysts . . . to discuss, among other things, the Company's earnings prospects, its products, the efficiency of the Company's manufacturing plants, anticipated financial performance, and to provide detailed "guidance" to these analysts with respect to the Company's business, including projected revenues, earnings, and of particular importance to analysts, earnings per share.

*Id.* The Class has only alleged that the analysts met with Peritus' senior management, including the Insiders, and that the analysts engaged in "conversations with management." *See* Compl. at ¶¶ 40, 46. These allegations fail by a wide margin to clear the Rule 9(b) standard of particularity, specifying neither the time, place nor content of the speaker's communication to the analysts. As such, the Court rules all statements by analysts nonactionable.

### F. The Claims Under Section 20(a) of the Exchange Act

Because the Court has ruled all challenged statements nonactionable both as to Peritus and the Insiders, the Class cannot show a primary violation under the Exchange Act. In the absence of a primary violation, secondary "controlling person" liability cannot exist. *See Suna*, 107 F.3d at 72; *In re Boston Tech.*, 8 F.Supp.2d at 72. Thus, the Court GRANTS the motion to dismiss the Section 20(a) claims.

## IV. *Conclusion*

For the foregoing reasons, the Court GRANTS in full the motions to dismiss (Dockets 30, 32, 34, 37).