Latigo Invs. II, LLC v. Waddell & Reed Fin., Inc., 2007 NCBC 17

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
06 CVS 18666

LATIGO INVESTMENTS II, LLC,
NELSON E. BOWERS, II and
JAY R. FRYE,

      Plaintiffs,

       v.

WADDELL & REED FINANCIAL, INC.,
WADDELL & REED, INC.,  SAMUEL V.
WATKINS and DONALD R. HAYES,

      Defendants.

**ORDER**

*Hagan Davis Mangum Barrett Langley & Hale, PLLC by J. Alexander S. Barrett and Stuart C. Gauffreau; Grant, Konvalinka & Harrison, PC by John P. Konvalinka and Charles G. Fisher, VI, for Plaintiffs Latigo Investments II, LLC, Nelson E. Bowers, II, and Jay R. Frye.*

*Kennedy Covington Lobdell & Hickman, LLP by Cory Hohnbaum and Brian L. Franklin; Blackwell Sanders Peper Martin, LLP by Jeffrey J. Kalinowski and Richard H. Kuhlman, for Defendants Waddell & Reed Financial, Inc., and Waddell & Reed, Inc.,*

Diaz, Judge.

{1}    Before the Court is the Motion of Defendants Waddell & Reed Financial, Inc., and Waddell & Reed, Inc., (collectively, "W&R") to Dismiss Plaintiffs' Fourth Claim for Relief pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the "Motion").

{2}    W&R's Motion seeks dismissal of Plaintiffs' claim alleging a violation of the North Carolina Unfair and Deceptive Trade Practices Act (the "UDTPA"), Section 75-1.1 of the North Carolina General Statutes.

{3}    After considering the Amended Complaint, the parties' briefs,[1] and the arguments of counsel, the Court **GRANTS** the Motion.

## I.

## PROCEDURAL BACKGROUND

{4}    Plaintiffs Latigo Investments II, LLC ("Latigo"), Nelson E. Bowers, II ("Bowers") and Jay R. Frye ("Frye") filed their Complaint on 21 September 2006.

{5}    Plaintiffs filed an Amended Complaint by consent on 8 February 2007.

{6}    The case was transferred to the North Carolina Business Court and assigned to me as a complex business case on 14 February 2007.

{7}    W&R filed the Motion and a supporting brief on 3 April 2007.

{8}    Plaintiffs filed a brief in opposition to the Motion on 27 April 2007, and W&R filed a reply on 7 May 2007.

{9}    On 22 May 2007, the Court heard oral arguments on the Motion.

## II.

## THE FACTS

## A.

## THE PARTIES

{10}    The following facts are taken from the Plaintiffs' Amended Complaint, which the Court accepts as true for purposes of the Motion.

{11}    Latigo is a Georgia limited liability company with its principal place of business located in Chattanooga, Tennessee.  (Am. Compl. ¶ 1.)

{12}    Bowers resides in Hamilton County, Tennessee, and is the owner of one hundred percent (100%) of the membership interests of Latigo.  (Am. Compl. ¶ 2.)

---

[1] The Court declines to consider Exhibit A attached to W&R's reply brief.

{13} Frye resides in Iredell County, North Carolina. (Am. Compl. ¶ 3.)

{14} Defendant Waddell & Reed Financial, Inc. is a Delaware corporation with its principal place of business in Shawnee Mission, Kansas. (Am. Compl. ¶ 4.)

{15} Defendant Waddell & Reed, Inc. also is a Delaware corporation with its principal place of business in Shawnee Mission, Kansas. (Am. Compl. ¶ 4.)

{16} Defendant Samuel V. Watkins ("Watkins") resides in Mecklenburg County, North Carolina. (Am. Compl. ¶ 5.)

{17} Defendant Donald R. Hayes ("Hayes") also resides in Mecklenburg County, North Carolina. (Am. Compl. ¶ 6.)

## B.

## THE CLAIMS

{18} Plaintiffs own MB2 Motorsports, LLC ("MB2"), a company "engaged in the business of owning and operating NASCAR auto racing teams." (Am. Compl. ¶¶ 8-9.)

{19} In or about March 2006, Plaintiffs determined that "MB2 needed an immediate and substantial infusion of capital, as a result of an accumulation of debt over a period of several years and the absence of a primary sponsor . . . ." (Am. Compl. ¶ 10.)

{20} Plaintiffs contacted a business broker, who solicited Watkins as a possible investor in MB2. (Am. Compl. ¶¶ 10-12.)

{21} The broker told Watkins that MB2 would not discuss any transaction with Watkins without evidence that Watkins could satisfy MB2's funding needs. (Am. Compl. ¶¶ 11-12.)

{22}  On or about 17 April 2006, MB2 received a letter from W&R attesting to Watkins's ability to invest up to $50 million in MB2 (hereinafter, the "W&R Letter").[2]  (Am. Compl. Ex. A.)

{23}  In reliance on the W&R Letter, Plaintiffs negotiated with Watkins and Hayes to purchase an ownership interest in MB2, to the exclusion of other potential suitors.  (Am. Compl. ¶¶ 11, 14, 19, 37.)

{24}  Watkins and Hayes, acting on behalf of RDS, offered to purchase a 30% interest in MB2 for $30 million and represented to the Plaintiffs that they could fund the transaction.  (Am. Compl. ¶ 16.)

{25}  On 4 May 2006, the parties executed a Reorganization Agreement, which purported to memorialize this transaction.  (Am. Compl. ¶ 17, Ex. B.)

{26}  Following execution of the Reorganization Agreement, the parties negotiated an Amended and Restated Operating Agreement for MB2 to reflect the newly acquired interest of Watkins and Hayes in the company.  (Am. Compl. ¶ 20.)

{27}  As part of these negotiations, Watkins or Hayes represented to the Plaintiffs that W&R intended to provide them with the necessary funding for the $30 million transaction on or before 30 May 2006.  (Am. Compl. ¶ 21.)

{28}  W&R failed to provide the necessary funding by the 30 May deadline and thereafter advised Frye that it would not be funding any portion of the $30 million transaction.  (Am. Compl. ¶ 34.)

{29}  As a result, Watkins and Hayes defaulted on their commitments under the Reorganization Agreement.  (Am. Compl. ¶ 36.)

---

[2] The W&R Letter refers specifically to the ability of non-party RDS Diversity Capital Corporation, Inc. ("RDS") to fund the transaction.  (*See* Am. Compl. Ex. A.)  Although the Amended Complaint is not clear on this point, it appears that RDS is either wholly or partially owned by Watkins and Hayes.

{30} Plaintiffs discovered later that RDS had never been formed or organized as a corporation, and that it had no capacity to fund the $30 million transaction. (Am. Compl. ¶ 36.)

{31} Because they had not pursued other potential investors while negotiating with Watkins and Hayes, Plaintiffs were forced to sell their interest in MB2 at a substantial discount to obtain adequate financing for the company. (Am. Compl. ¶¶ 37-38.)

{32} Plaintiffs allege breach of contract against Watkins and Hayes, and they allege claims for fraud, negligent misrepresentation, and unfair and deceptive trade practices against all Defendants. (Am. Compl. ¶¶ 39-66.)

## III.

## CONCLUSIONS OF LAW

## A.

## STANDARD OF REVIEW

{33} The essential question on a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure "is whether the complaint, when liberally construed, states a claim upon which relief can be granted on *any* theory." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 56, 554 S.E.2d 840, 844 (2001) (citations omitted) (emphasis in original). On a motion to dismiss, the complaint's material factual allegations are taken as true. *Id.* (citing *Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 575, 473 S.E.2d 680, 682 (1996)).

{34} When ruling on a Rule 12(b)(6) motion, the trial court should liberally construe the complaint and should not dismiss the action unless "it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Davis v. Messer*, 119 N.C. App. 44, 51, 457 S.E.2d 902, 906-07 (1995) (citation omitted).

**B.**

**ANALYSIS**

{35} To state a claim under the UDTPA, Plaintiffs must allege "(1) defendants committed an unfair or deceptive act or practice; (2) in or affecting commerce and (3) plaintiff was injured as a result." *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 439, 617 S.E.2d 664, 671 (2005).

{36} In this case, W&R asserts that the transaction at issue was a "capital-raising" device and, as such, was not "in or affecting commerce" as that element has been defined under North Carolina law. (Defs.' Mem. in Supp. of Mot. to Dismiss Pls.' Fourth Claim for Relief 2 (citing *Oberlin Capital*, 147 N.C. at 61, 554 S.E.2d at 848 (2001); *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594-95, 403 S.E.2d 483, 493 (1991)).)

{37} *HAJMM* and *Oberlin* have their genesis in the North Carolina Supreme Court's decision in *Skinner v. E. F. Hutton & Co., Inc.*, 314 N.C. 267, 333 S.E.2d 236 (1985). There, the Court held that "securities transactions are beyond the scope of N.C.G.S. § 75-1.1" in part because securities transactions are "'already subject to pervasive and intricate regulation'" under the North Carolina Securities Act and the federal securities laws. *Id.* at 275, 333 S.E.2d at 241 (quoting *Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 167-68 (4th Cir. 1985)).

{38} In *HAJMM*, the North Carolina Supreme Court expanded the securities exception to include "the trade, issuance and redemption of corporate securities or similar financial instruments . . . ." *HAJMM*, 328 N.C. at 594, 403 S.E.2d at 493.

{39} In *HAJMM*, owners of a turkey farm business sold their interest to an agricultural cooperative. *Id.* at 580, 403 S.E.2d at 485. In return, they received revolving fund certificates

that became part of the cooperative's capital structure and were shown as stockholder equity on the cooperative's balance sheet. *Id.*

{40} The former owners of the turkey farm sued to have the certificates retired by the defendant cooperative. In affirming the trial court's dismissal of the UDTPA claim, the *HAJMM* Court concluded that the revolving fund certificates were, in essence, corporate securities, and their purpose was to provide and maintain adequate capital for the enterprises at issue. *Id.* at 593, 403 S.E.2d at 493.

{41} According to the Court, the commerce element of a UDTPA claim applies to "the manner in which businesses conduct their regular, day-to-day activities, or affairs," while "the issuance of securities is an extraordinary event done for the purpose of raising capital . . . ." *Id.* at 594, 403 S.E.2d at 493. For that reason, the transactions in *HAJMM* were not "in or affecting commerce" and therefore, were beyond the scope of the UDTPA. *Id.* at 595, 403 S.E.2d at 493.[3]

{42} In *Oberlin,* our Court of Appeals expanded the reach of the UDTPA securities exception. In that case, plaintiff Oberlin Capital, L.P. agreed to provide working capital for an automotive parts corporation. 147 N.C. App. at 54, 554 S.E.2d at 843. Defendants served on the board of the corporation. *Id.* Oberlin Capital and the corporation executed a loan agreement that provided the corporation with a $1.5 million loan and gave Oberlin Capital a future right to purchase stock in the corporation's business. *Id.* The defendant directors ratified the loan agreement. *Id.* at 54-55, 554 S.E.2d at 843-44.

{43} The debtor corporation filed for bankruptcy sometime after executing the loan agreement. *Id.* Oberlin Capital subsequently discovered that the corporation and its directors failed to disclose certain negative financial information about the debtor that would have been material to

---

[3] In dissent, Justice Mark Martin noted that there is no support for the view that "'commerce' means only the 'regular, day-to-day activities or affairs' of a business" and, in fact, "[t]he plain words of the statute state otherwise." *HAJMM*, 328 N.C. at 596, 403 S.E.2d at 494 (Martin, J., dissenting).

Oberlin Capital's decision to make the loan. *Id.* at 55, 554 S.E.2d at 844. As a result, Oberlin Capital sued the individual directors alleging a host of tort claims and a separate UDTPA claim. *Id.*

{44}    Our Court of Appeals held that "[b]ecause the loan agreement at issue here, which also granted Oberlin the right to purchase stock in [the debtor corporation] in the future, was primarily a capital raising device, it was not 'in or affecting commerce' for the purposes of Chapter 75." *Id.* at 62, 544 S.E.2d at 848.

{45}    Plaintiffs in this case argue that the holdings in *HAJMM* and *Oberlin Capital* are limited to their facts and do not bar their UDTPA claim. More specifically, they assert that: (1) the transaction at issue in this case is not a capital raising device, but rather involves the sale of certain ownership interests in a company; (2) a UDTPA claim is proper because W&R's normal business activities includes arranging business financing;[4] (3) the UDTPA claim in this case does not directly concern the terms of a capital raising device but rather W&R's representations made in connection with their normal business activity; and (4) *HAJMM* and *Oberlin Capital* involved capital investors suing entities to which they provided capital whereas the Plaintiffs here were to be the beneficiaries of the capital investment. (Pls.' Br. in Resp. to Defs.' Mot. to Dismiss Pls.' Fourth Claim for Relief 3-7.)

{46}    Plaintiffs' attempts to distinguish *HAJMM* and *Oberlin Capital* are unavailing. As W&R aptly notes, the Court's proper focus under the relevant cases is not "who is a party to the transaction," but rather "what is the purpose of the transaction." (Defs.' Reply Mem. in Supp. of Mot. to Dismiss Pls.' Fourth Claim for Relief 3 (citing *Food Lion, Inc. v. CapitalCities/ABC, Inc.*, 194 F.3d 505, 520 (4th Cir. 1999)).)

---

[4] Plaintiffs, however, do not allege this fact in their pleading.

{47} Were I writing on a clean slate, I would not dismiss Plaintiffs' UDTPA claim as, like Justice Martin, I find no logical basis for excluding misrepresentations made in the context of capital raising transactions from the reach of what is intended to be a broad remedial statute.

{48} But under *HAJMM* and *Oberlin Capital,* the only relevant question for me is "whether the transactions at issue involved securities or other financial instruments involved in raising capital." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 304, 603 S.E.2d 147, 161 (2004). Plaintiffs' pleading leaves no doubt that this is precisely what the parties contemplated here. Moreover, as was the case in *Oberlin Capital,* Plaintiffs' UDTPA claim is premised on representations made by parties who were not principals to the original capital raising transaction, but who played a key role in facilitating the same.

{49} In sum, because the undisputed purpose of the transaction in this case, including the W&R Letter, was to raise capital for MB2, it is not a transaction "in or affecting commerce" as that element has been defined by the cases. Accordingly, Plaintiffs' UDTPA claim must be dismissed.

## CONCLUSION

{50} The Court **DISMISSES** Plaintiffs' Fourth Claim for Relief alleging a violation of the UDTPA.