Shamoon v. Turkow, 2011 NCBC 46.

STATE OF NORTH CAROLINA                    IN THE GENERAL COURT OF JUSTICE
                                                                          SUPERIOR COURT DIVISION
COUNTY OF WAKE                                              08 CVS 18850


CHARLES SHAMOON and DEBORAH          )
SHAMOON,                                                    )
                                  Plaintiffs                )
                                                                   )          **OPINION AND ORDER ON**
              v.                                                )          **PLAINTIFFS' MOTION FOR**
                                                                   )            **SUMMARY JUDGMENT**
ALLEN TURKOW and LUCY TURKOW,        )
                                  Defendants              )


        THIS CAUSE, designated a complex business case by Order of the Chief Justice

of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b)

(hereinafter, all references to the General Statutes will be to "G.S."), and assigned to

the undersigned Chief Special Superior Court Judge for Complex Business Cases, now

comes before the court upon Plaintiffs' Motion for Summary Judgment (the "Motion")

pursuant to Rule 56, North Carolina Rules of Civil Procedure ("Rule(s)"); and

        THE COURT, after considering the arguments, briefs, affidavits, other

submissions of counsel and appropriate matters of record, as discussed *infra*,

CONCLUDES that the Plaintiffs' Motion should be DENIED.

        *Poyner & Spruill, L.L.P., by Eric P. Stevens, Esq. for Plaintiffs.*

        *Harris & Hilton, P.A., by Nelson G. Harris, Esq. and Stephen P. Stewart, Esq. for
        Defendants.*

Jolly, Judge.

## PROCEDURAL HISTORY

[1]     Plaintiffs Charles and Deborah Shamoon filed their Complaint in this matter on October 29, 2009.  The Complaint alleges claims for relief ("Claim(s)") in two counts: First Count – Declaratory Judgment and Second Count – Temporary Restraining Order and Preliminary Injunction.

[2]     Defendants Allen and Lucy Turkow have answered timely and alleged claims for relief ("Counterclaim(s)") in five counts:  Declaratory Judgment, Fraud, Unfair and Deceptive Trade Practices, Negligent Misrepresentation and State Securities Fraud.

[3]     On September 21, 2009, Plaintiffs filed the Motion relative to their Claims and Defendants' Counterclaims.

[4]     The court has heard oral argument on the Motion, and it is ripe for determination.

## FACTAUL BACKGROUND

[5]     Unless otherwise indicated herein, the material facts reflected in paragraphs 6 through 23 of this Opinion and Order are undisputed[1] and are pertinent to the issues raised by the Motion.

[6]     Plaintiffs are developers of an invention described as the Ubiquitous Connectivity & Control System for Remote Locations (the "Invention").[2]

---

[1] It is not proper for a trial court to make findings of fact in determining a motion for summary judgment under Rule 56.  However, it is appropriate for a Rule 56 order to reflect material facts that the court concludes exist and are not disputed, and which support the legal conclusions with regard to summary judgment. *Hyde Ins. Agency v. Dixie Leasing*, 26 N.C. App. 138 (1975).
[2] Compl. ¶ 5.

[7]     The Invention is the subject of two (2) United States Patents (the "Patents").[3]  The Invention is also the subject of three (3) pending patent applications (collectively, the "Patent Applications").[4]

[8]     Sometime in May 2006, Defendants were approached by Nan Novatka ("Novatka"), an original investor in the Invention, who gave them a packet of information, which included some promotional literature on the Invention.[5]

[9]     After reviewing the information packet, Defendants informed Novatka that they wanted to purchase an ownership interest in the Invention.[6]

[10]    On May 29, 2006, Novatka set up a conference call between Plaintiffs and Defendants to discuss a potential investment in the Invention.[7]

[11]    At or around the time the parties began discussions regarding a possible investment, Plaintiff Charles Shamoon was also engaged in negotiations with General Electric Company ("GE") regarding a potential license agreement for the Invention.[8]

[12]    In 2006, Mike Bender ("Bender"), a business associate of Plaintiffs, had been in contact with Steven Connor ("Connor"), an executive level manager at GE Security, the division of GE that sold home security products.[9]  Connor indicated to Bender that GE was interested in either purchasing or licensing the Invention.[10]

[13]    Thereafter, Charles Shamoon and Bender had several conference calls with Connor and other GE employees regarding GE's interest in the Invention.[11]

---

[3] *Id.*
[4] *Id.*
[5] Ans. 10.
[6] *Id.*
[7] *Id.*
[8] Pls. Br. Supp. Mot. Summ. J. ("Pls. Brief") 5.
[9] *Id.* 7.
[10] *Id.*
[11] *Id.*

[14]    On or around April 11, 2006, Charles Shamoon and Bender traveled to Oregon to give a live demonstration and presentation about the Invention to GE employees.[12]

[15]    On May 31, 2006, Plaintiffs and Defendants entered in to an agreement (the "Agreement") regarding the Invention.  The Agreement states in full:

> We, Charles and Deborah Shamoon, hereby grant Allen & Lucy Turkow one-half percent ownership in the Ubiquitous Connectivity & Control System for Remote Locations for the sum of $60000.00.
>
> This grant of ownership entitles Allen & Lucy Turkow to one-half percent of all the proceeds from the sale of the Ubiquitous Connectivity & Control System for Remote Locations.[13]

[16]    Ultimately, Charles Shamoon's negotiations with GE were not successful.[14]

[17]    Sometime between December 2007 and January 2008, Charles Shamoon began to notice that GE was offering technology similar to that of the Invention.[15]

[18]    Starting in early 2008, Plaintiffs began working to generate revenue from the Patents through legal efforts to collect against companies, including GE, that allegedly were infringing upon the Patents.[16]  Rather than seeking proceeds from the sale of the Invention, Plaintiffs began to concentrate on collecting infringement revenue.[17]

---

[12] *Id.*
[13] Compl. Ex. A.
[14] Pls. Brief 11.
[15] *Id.*
[16] Compl. ¶ 8.
[17] *Id.*

[19]     Following this change in strategy, Plaintiffs offered Defendants and other investors the opportunity to enter into a proposed Agreement as to Disbursement of Net Proceeds of Settlement (the "Revised Agreement").[18]  The Revised Agreement provides that investors are entitled to their appropriate percentage share of the net proceeds from the settlement of any patent infringement suit with respect to the Invention.[19]

[20]     With the exception of Defendants, all investors entered into the Revised Agreement.[20]

[21]     Sometime in April 2008, Defendants began asserting that the Agreement gave them an undivided one-half percent (1/2%) ownership interest in the Patents.[21]

[22]     To support their claim of ownership of an undivided one-half percent (1/2%) interest in the Invention and all related Patents, Defendants submitted the Agreement for recordation at the U.S. Patent and Trademark Office.[22]

[23]     The parties disagree as to what type of ownership interest Defendants received under the Agreement.

## DISCUSSION

[24]     Under Rule 56(c), summary judgment is to be rendered "forthwith" if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that upon the forecast of evidence there exists no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.  *Grayson v. High Point Dev. Ltd. P'ship*, 175 N.C. App. 786, 788 (2006).

---

[18] *Id.* ¶ 9.
[19] *Id.*
[20] *Id.* ¶ 10.
[21] *Id.* ¶ 11.
[22] Ans. ¶ 12.

[25]     The court views the evidence in the light most favorable to the nonmoving party.  *Bruce-Terminix Co. v. Zurich Ins. Co.*, 130 N.C. App. 729, 733 (1998).

[26]     Plaintiffs seek summary judgment granting their request for a declaratory judgment that the Agreement only gave Defendants the right to one-half percent (1/2%) of all proceeds from the Invention and dismissing Defendants' Counterclaims.

<u>Plaintiffs' Claim for Declaratory Judgment</u>

[27]     Plaintiffs argue they are entitled to summary judgment granting their request for a declaratory judgment because the second sentence of the Agreement clearly defines Defendants' interest as only a "one-half percent of all the proceeds from the sale of the [Invention]."[23]

[28]     Defendants, on the other hand, argue that the Agreement gave them a one-half percent (1/2%) interest in the Invention itself, and that the second sentence is merely an explanation of one incident of ownership, not a limitation.[24]

[29]     Under North Carolina law, "[w]hen the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court." *Piedmont Bank & Trust Co. v. Stevenson*, 79 N.C. App. 236, 240 (1986); *see also In re Will of Jones,* 362 N.C. 569, 573 (2008) ("Where an agreement is clear and unambiguous, no genuine issue of material facts exists, and summary judgment is appropriate.").

[30]     If the language of the contract is clear and unambiguous, the court cannot look beyond the terms of the contract to determine the intentions of the parties.  *Id.* However, if the language of the contract is ambiguous, the effect of the contract must be

---

[23] *Id.*
[24] Defs. Br. Opp. Pls. Mot. Summ. J. ("Defs. Brief") 14-15.

determined by turning to extrinsic evidence because the question of the parties' intention becomes one of fact.  *Runyon v. Paley*, 331 N.C. 293, 305 (1992).

[31]    Whether the language of a contract is ambiguous or unambiguous is a question for the court to decide.  *Id.*  In interpreting a contract, "it must be presumed that the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean."  *Hagler v. Hagler*, 319 N.C. 287, 294 (1987).  "However, when there is ambiguity in the language used, the intent of the parties is a question for the jury . . . ."  *In re Will of Jones*, 362 N.C. at 573 (internal citation omitted).

[32]    Plaintiffs and Defendants differ in their interpretations of what type of ownership interest Defendants received under the Agreement.  The central issue is whether the second sentence of the Agreement limits Defendants' ownership interest to one-half percent (1/2%) of proceeds or merely describes one incident of ownership in the Invention.  To answer this question, as a matter of law, the court must decide whether the language of the Agreement is susceptible to more than one reasonable interpretation.  *See Dockery v. Quality Plastic Custom Molding, Inc.*, 144 N.C. App. 419, 422 (2001).

[33]    The first sentence of the Agreement provides that Defendants receive one-half percent (1/2%) ownership in the Invention in exchange for the sum of $60,000.[25]  Viewing this sentence by itself, it appears to be a grant of an undivided ownership interest in the Invention.  However, the second sentence goes on to state that the above grant of ownership entitles Defendants to one-half percent (1/2%) of all

---

[25] Compl. Ex. A.

the proceeds from the sale of the Invention.[26]  The second sentence of the Agreement can be construed as either a limitation on Defendants' ownership interest or a description of one of the incidents of ownership.

[34]    Viewing the evidence in the light most favorable to Defendants, the question of whether the parties intended the second sentence of the Agreement to limit Defendants' ownership or clarify one incident of ownership is susceptible to two differing, yet reasonable, interpretations put forth by the parties.

[35]    Because the Agreement is susceptible to more than one reasonable interpretation, it is ambiguous.  The court cannot say as a matter of law whether Defendants are entitled to one-half percent (1/2%) ownership in the Invention or one-half percent (1/2%) of the sale proceeds.

[36]    Accordingly, the court CONCLUDES that there exist one or more genuine issues of material fact as to the interpretation of the Agreement.  Plaintiffs' Motion with regard to their Claim for declaratory judgment therefore should be DENIED.

Defendants' Counterclaims

Fraud

[37]    It is well settled in North Carolina that to support a claim for fraud, a claimant must prove that there existed (a) a false representation or concealment of a material past or existing fact; (b) that was reasonably calculated to deceive; (c) that was made with an intent to deceive; (d) that did in fact deceive, *i.e.*, was relied upon and (e) resulted in damage to the injured party.  *State Props., LLC v. Ray*, 155 N.C. App. 65, 72 (2002); *Helms v. Holland*, 124 N.C. App. 629, 634 (1996).

---

[26] *Id.*

[38]    Further, if there was in fact reliance upon the representation or concealment, an actionable claim for fraud requires the reliance to have been reasonable.  *Johnson v. Owens*, 263 N.C. 754, 756 (1965).  "The reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion."  *Little v. Stogner*, 162 N.C. App. 25, 30 (2004) (internal quotation omitted).

[39]    A statement of opinion ordinarily cannot be the basis of a cause of action for fraud.  *Leftwich v. Gaines*, 134 N.C. App. 502, 508 (1999) ("As a general rule, a mere promissory representation will not be sufficient to support an action for fraud.").  However, "a statement purporting to be opinion may be the basis for fraud if, at the time it is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener."  *Id.* at 508-09.

[40]    Defendants argue that several representations made by Charles Shamoon in May 2006 were fraudulent.  They point out that when Novatka asked Charles Shamoon when he expected to have money in hand from a deal with GE, he replied "sixty, ninety, worst case scenario, one hundred and twenty days."[27]  Further, Charles Shamoon told Novatka and Defendants that he was "at the finishing line" with an original equipment manufacturer (GE) regarding a sale of the Invention.[28]

[41]    Plaintiffs argue these statements were nothing more than honest predictions and opinions about GE's interest in the Invention, and that these opinions cannot be the basis of a fraud claim.[29]

---

[27] Lucy Turkow Dep. 58.
[28] *Id.* 46-47.
[29] Pls. Brief 14-15.

[42]     Defendants respond that following the April 11, 2006 meeting with GE officials, Charles Shamoon understood that discussions for a possible licensing agreement would not begin until early 2007, well after he made the representations at issue to Defendants[30]  Defendants argue that because Charles Shamoon knew meaningful negotiations between himself and GE would not begin until early 2007, his May 2006 statements that a deal was close and that money would be changing hands were false representations of existing fact.[31]

[43]     Viewing the evidence in the light most favorable to Defendants, the court CONCLUDES that there exist one or more genuine issues of material fact as to what Charles Shamoon knew in May 2006, when he made the representations to Defendants, and whether he knew these representations were false when he made them.  Plaintiffs' Motion with regard to Defendants' Counterclaim for fraud therefore should be DENIED.

Negligent Misrepresentation

[44]     To state a claim for negligent misrepresentation under North Carolina law, a claimant must allege that (a) the claimant justifiably relied (b) to his detriment (c) on information prepared without reasonable care (d) by one who owed the relying party a duty of care.  *Brinkman v. Barrett Kays & Assocs.*, 155 N.C. App. 738, 742 (2003) (internal quotation omitted).

[45]     A breach of the duty owed in negligent misrepresentation occurs when "[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the

---

[30] Defs. Brief 20.
[31] *Id.*

guidance of others in their business transactions . . . ." *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 218 (1999).

[46]    Plaintiffs argue that the Defendants' Counterclaim for negligent misrepresentation should be dismissed because predictions of future business success do not constitute the type of information that can form the basis for such a claim.[32] Plaintiffs also argue any reliance by the Defendants on Charles Shamoon's statements was unreasonable because Defendants were experienced in business and should have known that a licensing agreement with GE would not be final until it was signed.[33]

[47]    Defendants do not directly respond to Plaintiffs' arguments that future business predictions cannot form the basis of a negligent misrepresentation claim, but Defendants do contend their reliance on Charles Shamoon's representations was reasonable.[34]  Defendants argue that they trusted Charles Shamoon and relied on his representations because he and his wife were members of the same church that Defendants attended.[35]

[48]    In negligent misrepresentation cases, whether liability accrues is fact-dependent. *Marcus Bros. Textiles,* 350 N.C. at 220 (internal quotation omitted).  "As such, summary judgment is seldom appropriate in these types of cases, unless the evidence is free of material conflict, and the only reasonable inference that can be drawn therefrom is that there was no negligence on the part of defendant, or that his negligence was not the proximate cause of the injury." *Id.* (internal quotation omitted).

---

[32] Pls. Brief 17.
[33] *Id.*
[34] Defs. Brief 26.
[35] *Id.*  25.

Furthermore, the question of justifiable reliance is usually one for the fact-finder. *Id.* at 224.

[49]    Defendants have alleged facts sufficient to show Charles Shamoon made certain representations in the course of his business, in a transaction in which he had a pecuniary interest and for the guidance of Defendants in their own business transactions.[36]

[50]    The question of whether Defendants reasonably relied on Charles Shamoon's representations is a matter for the fact finder to decide.

[51]    Accordingly, the court CONCLUDES that there exist one or more genuine issues of material facts as to whether Charles Shamoon's statements rose to the level of negligent misrepresentation and whether the Defendants' reliance on such statements was reasonable.  Plaintiffs' Motion with regard to Defendants' Counterclaim for negligent misrepresentation therefore should be DENIED.

<u>Unfair or Deceptive Trade Practice</u>

[52]    To establish a claim for unfair and deceptive trade practices, a claimant must show: (a) the adverse party committed an unfair or deceptive act or practice, (b) the action in question was in or affecting commerce and (c) the act proximately caused injury to the claimant.  *Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 41 (2006).

[53]    Plaintiffs argue that Defendants' unfair and deceptive trade practices Counterclaim should be dismissed because the North Carolina Unfair and Deceptive Trade Practices Act (the "UDTPA") does not apply to securities transactions.[37]  Plaintiffs

---

[36] Ans. 9-10.
[37] Pls. Brief 20.

characterize their negotiations with the Defendants and the resulting Agreement as a securities transaction.[38]

[54]    Plaintiffs rely on *Hajmm Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578 (1991), in support of their argument that securities transactions are not subject to the UDTPA.[39]

[55]    *Hajmm* had its "genesis in the North Carolina Supreme Court's decision in *Skinner v. E. F. Hutton & Co., Inc.*, 314 N.C. 267 (1985)."  *Latigo Invs. II, LLC v. Waddell & Reed Fin., Inc.*, 2007 NCBC 17, ¶ 37 (N.C. Super. Ct. June 8, 2007).  In *Skinner*, the Supreme Court held that securities transactions are beyond the scope of the UDTPA because securities transactions are already subject to pervasive regulation under both state and federal securities law.  314 N.C. at 275.  *Hajmm* "expanded the securities exception to include 'the trade, issuance and redemption of corporate securities or similar financial instruments . . . .'"  *Latigo*, 2007 NCBC 17, ¶ 37 (quoting *Hajmm*, 328 N.C. at 594).  At issue in *Hajmm* were revolving fund certificates, issued for the purpose of building up capital.  328 N.C. at 593.  The Supreme Court concluded that since the "issuance of securities is an extraordinary event done for the purpose of raising capital," it is not in or affecting commerce and therefore beyond the scope of the UDTPA.  *Id.* at 595.

[56]    Defendants respond that the transaction at issue was not for the purpose of raising capital, but instead was a method by which Charles Shamoon could generate personal income.[40]

---

[38] *Id.*
[39] *Id.*
[40] Defs. Brief 29.

[57] The issue here is whether Charles Shamoon's solicitation of Defendants' investment was primarily a "capital raising device" or a transaction to produce personal income for Charles Shamoon. It is likely that the former would make the solicitation a securities transaction and the latter would make it an activity subject to the UDTPA. *See Latigo*, 2007 NCBC 17, ¶ 36.

[58] Whether Plaintiffs solicited investments for raising capital for the Invention or used the investments as personal income is a question of fact.

[59] Accordingly, the court CONCLUDES that there exist one or more genuine issues of material fact as to whether the transaction between Plaintiffs and Defendants is a securities transaction not subject to the UDTPA. Plaintiffs' Motion with regard to Defendants' Counterclaim for unfair and deceptive trade practices therefore should be DENIED.

## Securities Fraud

[60] G.S. 78A-56(a) imposes civil liability upon any person who:

> Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of the untruth or omission . . . .

[61] A "security," as defined by G.S. 78A-2(11), includes investment contracts.

[62] Plaintiffs argue that because the Agreement is an investment contract, it is a security subject to the North Carolina Securities Act (the "Securities Act").[41] They also

---

[41] Pls. Brief 18. Plaintiffs' theory apparently is that this would eliminate exposure on their part to liability under the UDTPA.

argue that projections of future business performance, as complained of here by Defendants, are not actionable under the Securities Act.[42]

[63]    Defendants disagree with Plaintiffs' arguments with regard to the Securities Act.  They contend that regardless of whether the Agreement constitutes a security, Charles Shamoon's statements are actionable under the Securities Act because they were untrue statements of material fact.[43]

[64]    Plaintiffs rely on several Fourth Circuit cases, including *Raab v. General Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993), for their contention that business predictions cannot give rise to securities fraud claims because they are not guarantees. *See also Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 209-10 (4th Cir. 1994); *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 146 (4th Cir. 2002); *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994).

[65]     Defendants allege that at the time the parties were in negotiations in May 2006, Charles Shamoon knew that a deal with GE would not even be up for discussion until early 2007.[44]  Despite this knowledge, Defendants allege, Charles Shamoon made representations that he was at the "finishing line" with GE regarding a sale of the Invention and that money would be changing hands in "sixty, ninety, worst case scenario, one hundred and twenty days."[45]

---

[42] *Id.* 18-19.
[43] Defs. Brief 28.
[44] *Id.* 20.
[45] *Id.* 20-21.

[66]     Defendants argue Charles Shamoon was not merely making general predictions about future business opportunities, but instead was misstating present material facts.[46]

[67]     As discussed earlier, whether the transaction between Plaintiffs and Defendants is a security subject to the Securities Act is a question of fact, dependent upon the interpretation of the Agreement and the ownership interest received by the Defendants.  Furthermore, if the transaction is subject to the Securities Act, there are genuine issues of fact as to what Charles Shamoon knew when he made the statements to Defendants and whether these statements were false.

[68]     Accordingly, the court CONCLUDES that there exist one or more genuine issues of material fact as to whether Plaintiffs violated the North Carolina Securities Act. Plaintiffs' Motion with regard to Defendants' Counterclaim for securities fraud therefore should be DENIED.

NOW THEREFORE, based upon the foregoing, it hereby is ORDERED that:

[69]     Plaintiffs' Motion for Summary Judgment is DENIED.

[70]     On Tuesday, December 20, 2011, beginning at 11:00 a.m., in the North Carolina Business Court at 225 Hillsborough Street, Suite 303, Raleigh, North Carolina, the court will hold a status conference in this matter.  At that time the court will determine whether further pre-trial proceedings are necessary and set a date for trial. Counsel and all individual parties shall appear at the status conference.

This the 6th day of December, 2011.

---

[46] *Id.*